**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Linda M. Peterson, | No. CV-05-1622-PHX-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| Federal Express Corporation Long Term Disability Plan; Federal Express Corporation; Broadspire, Inc., | |
| Defendant. | |

TABLE OF CONTENTS

I.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    The Scope of Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    C.    Peterson's Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.    Eligibility for Short-Term Disability Payments . . . . . . . . . . . . . . . 4

        2.    Eligibility for Long-Term Occupational Disability Payments . . . . . 8

        3.    Broadspire's First Denial of Long-Term Total Disability
           Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        4.    Peterson's Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        5.    Broadspire's Recommendation to Deny Long-Term Total
           Disability Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        6.    FedEx's Final Denial of Coverage . . . . . . . . . . . . . . . . . . . . . . . . 27

II.   *Abatie* Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    A.   The Standard of Review is Abuse of Discretion . . . . . . . . . . . . . . . . . . . . 30

    B.   FedEx Exercised Discretion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    C.   A Moderate Level of Scrutiny is Warranted . . . . . . . . . . . . . . . . . . . . .  31

        1.   Untimely Notice of Decision  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        2.   Conflict of Interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        3.   Disclosure of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        4.   Inconsistent Reasons for Denial . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        5.   Use of an Independent Medical Evaluation . . . . . . . . . . . . . . . . . . 38

        6.   Failure to Credit Evidence of Disability . . . . . . . . . . . . . . . . . . . . . 39

    D.   Whether FedEx Abused its Discretion  . . . . . . . . . . . . . . . . . . . . . . . . . . 47

        1.   FedEx Did Not Abuse its Discretion in Interpreting the Plan  . . . . 48

        2.   FedEx Abused is Discretion in Interpreting the Medical Record . . 49

1    Pending before the court are Plaintiff's Motion for Summary Judgment (Doc. # 48)

2    and Defendants' Cross-Motion for Summary Judgment (Doc. # 52).

3    **I.    Background**

4        **A.    The Parties**

5        Plaintiff Linda M. Peterson is a 57 year-old former inside-sales account executive for

6    Defendant Federal Express Corporation ("FedEx").  Peterson's position at FedEx required

7    her to contact customers, maintain account records, and assist with the implementation of

8    various marketing programs, among other duties.  Those responsibilities in turn required

9    continuous typing on a computer keyboard, constant use of a computer mouse, and frequent

10    use of a telephone. A.R. at 236, 244.  Because Peterson was a permanent full-time employee

11    who worked for FedEx for more than 180 days, she is a "covered employee" under the

12    Federal Express Long-Term Disability Plan (the "Plan"). A.R. at 416-17.

13        FedEx is the administrator of the disability Plan.  Defendant Broadspire, Inc.

14    ("Broadspire"), an entity formerly known as the Kemper Insurance Company ("Kemper"),

15    is a third-party claims paying administrator under the Plan and utilizes independently

16    contracted physician consultants to evaluate the merits of long-term disability claims.

17    Broadspire's website boasts that the company saved clients such as FedEx an average of "six

18    business days and $825 per short-term disability case in 2005" and that its "end result is a

19    commitment to treat client's [sic] money like it is our own and an ability to close claims

20    faster with better results."  Doc. # 48, Exh. A at 1, 3.

21        **B.    The Scope of Coverage**

22        The Plan provides two possible forms of disability payments to covered employees.

23    First, in the event of an occupational disability, the Plan provides benefits equal to 60% of

24    the employee's monthly income for up to two years.  "Occupational disability" is defined as

25    the "inability of a Covered Employee, because of a medically-determinable physical

26    impairment or Mental Impairment (other than an impairment caused by a Chemical

27    Dependency), to perform the duties of his regular occupation."  A.R. at 410.  Second, if a

28                                      1

covered employee seeks to receive benefits for more than two years, she must show that she is "totally disabled." "Total disability" is defined as

> the complete inability of a Covered Employee, because of a medically determinable physical impairment (other than an impairment caused by a mental or nervous condition or a Chemical Dependency), to engage in any compensable employment for twenty-five hours per week for which [she] is reasonably qualified (or could reasonably become qualified) on the basis of [her] ability, education, training or experience.

A.R. at 415. The summary plan description ("SPD") similarly explains that "total disability" means that the employee "cannot engage in any compensable employment for 25 hours per week for which [she] is reasonably qualified or could reasonably become qualified on the basis of [her] ability, education, training or experience." A.R. at 393.

The presence of an occupational or total disability must be substantiated by "significant objective findings." Such findings are defined by the Plan as "signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms. A.R. at 406. The SPD explains that these findings include "medical examination findings," "test results," "x-ray results," and "observation of anatomical, physiological or psychological abnormalities." A.R. at 395. "Pain, without significant objective findings, is not proof of disability." *Id.* The Plan also contains a "proof of disability" provision that provides as follows:

> No Disability Benefit shall be paid under the Plan unless and until the Claims Paying Administrator has received an application therefor and information sufficient for the Claims Paying Administrator to determine pursuant to the terms of the Plan that a Disability exists. Such determination shall be made in a fair and consistent manner for all participants in the Plan. Such information may, as the Claims Paying Administrator shall determine, consist of a certification from the Covered Employee's attending Practitioner, in the form prescribed by the Claims Paying Administrator, information in the form of personal references, narrative reports, pathology reports, x-rays and any other medical records or other information as may be required by the Claims Paying Administrator.

A.R. at 447.

2

The Plan also allocates authority for the evaluation of applications for disability benefits. FedEx is provided with the power to "designate any other entity" as the claims paying administrator. Responsibility for claims handling lies with the "Administrator and Claims Paying Administrator to the extent such duties are delegated to it by the Administrator." A.R. at 459. Although the Plan gives FedEx the "right at any time to modify, alter, or amend the Plan in whole or in part," nothing in the Plan specifically identifies Broadspire, as opposed to its predecessor, Kemper, as the claims paying administrator. A.R. at 463.

The Plan further provides that FedEx may exercise discretion in deciding whether an employee is totally disabled:

> The Administrator is the named fiduciary of the Plan and shall have the absolute right and power to construe and interpret the provisions of the Plan and administer it for the best interest of the Employees. . . . [T]he Administrator's authority shall include, but shall not be limited to, the following powers:
>
> (a) to construe any ambiguity and interpret any provision of the Plan or supply any omission or reconcile any inconsistencies in such manner as it deems proper;
>
> (b) to determine eligibility for coverage under the Plan in accordance with its terms; and
>
> (c) to decide all questions of eligibility for, and determine the amount, manner and time of payment of, benefits under the Plan in accordance with its interpretation of its terms.

A.R. at 458-59; *see also* A.R. at 403 (defining the "Administrator" as Federal Express). The Benefits Review Committee possesses similar authority:

> The committee . . . shall be empowered to interpret the Plan's provisions in accordance with its terms with respect to all matters properly brought before it . . . including, but not limited to, matters relating to the eligibility of a claimant for benefits under the Plan. The determination of the committee shall be made in a fair and consistent manner in accordance with the Plan's terms and its decision shall be final, subject only to a determination by a court of competent jurisdiction that the committee's decision was arbitrary and capricious.

3

1   A.R. at 453.  The Committee "normally issues a decision . . . within 90 days of receipt of [a]

2   request" for payments.  A.R. at 385.

3         If it is decided that benefits should be awarded, the expense "shall be charged against

4   the Plan and the [Plan's] Trust Fund unless [FedEx] elect[s] to pay such expenses."  A.R. at

5   461.  The Trust Fund is maintained by annual contributions from FedEx in "such amounts

6   as are actuarially determined to be sufficient to fund on a level basis the benefits provided"

7   under the Plan. A.R. at 445.  Once made, contributions to the Trust Fund are irrevocable, and

8   it is

9             impossible for any part of the net earnings of the Trust Fund to
              inure to the benefit of any private shareholder or individual
10            other than through the payment of Disability Benefits, or for any
              assets thereof to inure to the benefit of the Employer or to be
11            used in any manner other than for the exclusive purpose of
              providing Disability Benefits to Covered Employees and for
12            defraying reasonable expenses of administering the Plan.

13   A.R. at 446.  Value withdrawn from the Trust Fund for the purpose of making disability

14   payments "shall be reduced by the sum of any primary benefits payable to the Disabled

15   Covered Employee because of age under the Federal Social Security Act, but excluding any

16   cost of living increases which occur after the initial payment of such benefits."  A.R. at 441.

17       **C.    Peterson's Condition**

18           **1.    Eligibility for Short-Term Disability Payments**

19         Between 1987 and January 2002, Peterson was involved in three automobile accidents

20   that resulted in injury to her neck and back.  In approximately October 2001, she also began

21   to suffer from increasing pain and numbness in her right wrist and thumb that correlated with

22   her use of a keyboard, computer mouse, and telephone at work.  The numbness subsequently

23   spread to her index and middle fingers.  Peterson initially used a volar wrist splint in an

24   attempt to alleviate her symptoms, but the pain continued to increase.

25         Peterson's original primary care physician, Angela L. Hinds, M.D., referred her to

26   Peter J. Campbell, M.D., an orthopedic surgeon, on November 8, 2001, for a diagnostic wrist

27   and hand evaluation.  After taking x-rays and observing Peterson's range of motion,

28                                                4

Campbell found that Peterson "has signs and symptoms of tendinitis as well as median nerve impingement at the wrist" and a "palpable mass on the volar radial aspect of the wrist." A.R. at 266. He concluded that Peterson suffered from de Quervain's tenosynovitis, "suspected" carpal tunnel syndrome, and a volar wrist ganglion. *Id.* To facilitate rehabilitation, Campbell recommended that Peterson use a thumb spica split and avoid the use of her right hand. He also ordered a nerve conduction study and placed Peterson on at least temporary "no work status" because her symptoms were "aggravated by her activities utilizing a keyboard and computer mouse." *Id.* Due to her conditions, Peterson filed for short-term disability benefits with FedEx and began to receive payments on November 12, 2001. The nerve conduction study, performed by K. Sivakumar, M.D., on December 10, 2001, revealed a "median nerve lesion of mild severity" in Peterson's right wrist. A.R. at 267.

During a follow-up visit with Campbell on December 20, 2001, Peterson reported that her symptoms had improved since the start of her time off work. She also reported concern that returning to work would re-aggravate her condition because even limited use of her computer at home triggered mild discomfort. Campbell noted that the nerve conduction study performed on December 10 confirmed the presence of "mild carpal tunnel syndrome." A.R. at 264. He recommended that Peterson either return to work to see if her pain recurs or receive corrective surgery.

On March 5, 2002, Peterson visited Alan J. Discont, D.P.M., with an unrelated complaint of increasing pain in her heel. Discont observed "pain to palpation along the plantar, medial, central aspect of the right/left heel, fascia and the inferior calcaneal area." A.R. at 183. Antalgia and pain upon "dorsal flexion of the forefoot" were also noted. *Id.* Ruling out the possibility that Peterson suffered from subcalcaneal heel spurs, plantar fasciitis, calcaneal stress fracture, or posterior tibial compensation syndrome, Discont recommended a tailored exercise program, ice packs, and the use of an orthotic device. Peterson underwent surgery for her carpal tunnel, de Quervain's tenosynovitis, and volar

1    wrist ganglion a few days later.  She also received injections in her heels and arches on April

2    9, 2002, after the more conservative pain treatments proved ineffective.  A.R. at 176.

3    During a post-operative check-up on April 16, 2002, Peterson indicated that she

4    suffered pain at the location of her surgical incision and experienced "new pain on the ulnar

5    aspect of [her] wrist."  A.R. at 263.  Campbell continued to recommend that she not return

6    to work.  *Id.*  He cautiously added, "I would anticipate she could return to at least modified

7    duties in the next few weeks, however, this prognosis is guarded in this individual."  *Id.*

8    Upon Hinds's referral, Peterson next visited a rheumatologist, Paul H. Caldron, D.O.,

9    on April 18, 2002, for evaluation in light of complaints of myalgia.  Peterson reported that

10   the injections had failed to control the pain in her foot and that the carpal tunnel surgery also

11   failed to result in any improvement in her hand and wrist.  Caldron noted that Peterson had

12   a history of depression, poor sleep patterns, and frequent headaches.  His physical

13   examination found that she exhibited a decreased range of neck motion to 45 degrees

14   bilaterally, "mild to moderate point tenderness in 14 out of 18 sites," and knees with "some

15   mild crepitus bilaterally."  A.R. at 177.  However, Caldron also found no "percussive

16   tenderness" across Peterson's spine, "unremarkable" characteristics in her ankles and feet,

17   a full range of motion in her hips, and an absence of swelling and erythema.  *Id.*  Caldron

18   assessed that Peterson suffered from myalgias with poor sleep patterns "consistent with

19   fibromyalgia," carpal tunnel syndrome, plantar fasciitis, osteopenia, hyperlipidema, and a

20   history of phlebitis.  *Id.*  Peterson was instructed that her fibromyalgia would improve if she

21   followed an aerobic conditioning program.

22   Over the course of multiple subsequent visits to Campbell between May 2 and

23   September 19, 2002, the condition of Peterson's hand and wrist slowly improved.  On May

24   9, her hand function was categorized as "not working," but sensation was noted as "normal,"

25   range of motion was full, and the pain was "manageable."  A.R. at 256.  Exercises were

26   recommended to further increase Peterson's hand strength.  By May 14, the tenderness in

27   Peterson's hand had also improved.  A.R. at 255.  By May 20, Peterson could lift items

28

weighing 6-10 pounds and exert comparable force with her right hand. A.R. at 262. By May 22, she was capable of "light duty" at work, A.R. at 253, and by June 13 she no longer needed a spica splint, A.R. at 250. In some tension with these recorded improvements, however, Campbell's notes from September 3, 2002, indicate that Peterson could not lift items weighing more than one pound with her right hand. A.R. at 261.

Meanwhile, Peterson continued to collect disability payments and receive care from a variety of other physicians. On May 9, 2002, she was examined by Steven M. Ortiz, M.D., in light of her various musculoskeletal complaints. A.R. at 226. Ortiz noted that Peterson suffered from fibromyalgia that caused pain in both elbows, both wrists, her right knee, her lower back, and her foot. The most severe pain was in Peterson's neck and shoulders, and she experienced occasional numbness and tingling throughout her upper extremities. Although Peterson's neck pain in particular was constant, massages, spas, and anti-inflammatory medications reportedly resulted in some relief. Ortiz also noted that Peterson suffered depression, anxiety, and a history of "TMJ," an acronym used to indicate pain or dysfunction in the temporomandibular joint. His physical examination found that she had an erect standing posture, normal curvature in her upper spine, level shoulders, normal cervical rotation, normal flexion, a full range of motion of both upper extremities in all planes, and "no obvious distress." A.R. at 227. Peterson did, however, have a slightly restricted range of motion in bending to her right and left sides, a positive response to a test used to indicate the presence of carpal tunnel syndrome, "diffuse tenderness points . . . consistent with fibromyalgia," and pain to palpation of her trapezius and rhomboid muscles, neck, and upper back. *Id.* Ortiz diagnosed cervical facet syndrome, a condition that is characterized by pain and a decreased range of motion of the neck. An MRI revealed "some cervical spondylosis," a condition involving progressive deterioration of the bones and disks in the neck. A.R. at 228. Ortiz also diagnosed "fibromyalgia vs. myofascial pain syndrome involving the periscapular musculature" and TMJ. *Id.* Physical therapy was recommended.

7

## 2.    Eligibility for Long-Term Occupational Disability Payments

After Peterson received the maximum six months of short-term disability benefits, FedEx placed her on long-term occupational disability on May 13, 2002, thereby entitling her to as much as two more years of additional payments. With the assistance of Allsup, Inc., a company contracted with FedEx to help FedEx employees apply for Social Security benefits, Peterson also began to receive Social Security disability payments at the rate of $692 per month. The Social Security award permitted a proportionate reduction in the value of FedEx's occupational disability payments under the terms of the Plan.

On May 15, Peterson saw Kellie Ostransky, M.P.T., for physical therapy. Peterson reported that she suffered from a "deep ache" along the length of her neck, stiffness and pain in the morning that lasts for approximately 30 minutes, an inability to sleep well, and a diffusion of pain affecting her bilateral upper trapezius, inner scapular muscles, elbow, forearm, knees, and feet. She also reported that she is unable to sit for more than 30 minutes at a time or turn her head to look over either of her shoulders. Her medications at the time included Darvocet for pain, Klonopin, Fosamax, Augmentin, and Tylenol PM. She did not report any dizziness, nausea, or parasthesia in her upper extremities. Ostransky observed that Peterson exhibited tenderness around her neck, a restricted range of neck motion, muscle weakness, and poor posture, with a "right cervical shift and tilt in the upper cervical spine." A.R. at 230. Three sessions of physical therapy were planned for each week over the course of the next month.

On July 1, 2002, Peterson visited Caldron for a follow-up visit concerning her fibromyalgia. Caldron found that the fibromyalgia persisted, as Peterson continued to exhibit "all the classic tender points to include occipital insertion site, low cervical, supraspinatus, anterior chest wall, lateral epicondyles, gluteal fold, and greater trochanters." A.R. at 175. Klonopin was again prescribed for treatment. Additional physical therapy was ordered by Ortiz on August 7, 2002. A.R. at 229. Although Peterson's long-term occupational disability

payments were terminated on July 1 upon her temporary return to work, they were re-instituted on September 3.  *See* A.R. at 9, 342.

Peterson reported little improvement during another visit with Caldron on October 2, 2002.  She stated that her physical therapy was ineffective for her upper spine and that she still experienced significant pain and soreness in her neck, back, and right knee.  Although she was reluctant to give up on her job, Peterson remained off work.  Caldron observed that she was anxious and exhibited "tightness and tenderness" around her neck, decreased cervical rotation, "notable crepitus at the knees," and "tenderness to the 2nd anterior rib attachments and proximal forearms." A.R. at 174.  The updated diagnosis was that Peterson continued to suffer from fibromyalgia, cervical osteoarthritis, lumbar spine osteoarthritis, knee osteoarthritis, migraines, hyperlipidemia, and osteopenia.

On October 14, 2002, Peterson received a functional capacity evaluation to determine whether she was capable of returning to work.  The examination was performed by Pam Williams, a licensed physical therapist, over the course of four hours.  Peterson reported to Williams that she "performs all [activities of daily living, but] has difficulty performing them in a timely manner" and encounters pain when "turning door knobs, putting on bras, opening jars, writing, and shaking hands." A.R. at 236.  Peterson described her pain as continuous, ranging in severity from 5/10 to 8/10, and increasing with "overuse and particularly mouse activities." *Id.*  Williams observed that Peterson's gait and gross functional mobility were "within normal limits," that she suffered no significant neurological conditions in her hands, that her carpal tunnel syndrome was gone, that she did not exhibit any "overt pain behaviors," and that she "demonstrated safe body mechanics with all functional testing." A.R. at 237-38.  Peterson did, however, exhibit some numbness in her right little finger, tenderness upon palpation of her neck and wrist, and difficulty "performing safe squatting . . . due to bilateral LE weakness and knee pain." A.R. at 238.  From tests involving lifting, pulling, carrying, and kneeling, Williams concluded that Peterson could sit for an entire eight-hour workday and stand and walk for periods ranging from 34 to 66 percent of the

same period. A.R. at 241. Considering all of this evidence, and assuming employment that required eight hours per day and forty hours per week, Williams found that Peterson "demonstrates the safe ability to perform sedentary work safely, with occasional use of the right upper extremities." A.R. at 239. Peterson's "chief complaints of right ulnar sided wrist pain, parasthesia in a ulnar nerve distribution, and positive special tests" were found to be inconsistent with "the stated diagnoses." *Id.*

Peterson made another visit to Ortiz on November 4, 2002, complaining of persistent pain across her neck and back. Ortiz found that her range of motion remained restricted, that "facet loading" provoked "some left-sided pain," and that she had "some myofascial trigger points across the neck, suboccipital area, [and] . . . periscapular muscles on the left side." A.R. at 225. However, Peterson was in "no obvious distress," and a neurological examination showed no focal motor deficits. A.R. at 225. Ortiz injected a total of six shots containing Lidocaine and Marcaine at various sites around Peterson's neck to control her pain. The injections reportedly provided only temporary relief. A.R. at 224.

On November 15, 2002, Peterson received another functional capacity evaluation from Scot A. McCoy, M.O.T., a certified hand therapist. McCoy found that Peterson exhibited some limitations in right wrist extension, strength deficits in her right hand and wrist, significant bilateral dexterity deficits, and an ability to complete only "approximately 30 minutes of computer keyboard input with moderate right hand pain complaints, as well as more proximal and back pain complaints." A.R. at 247. Peterson reported that her wrist, shoulder, neck, and back pain was "7/10" in average severity and manifested through stiffness, achiness, tingling, throbbing, and numbness. McCoy found that although the reported pain presented a "significant limiting factor with regard to [Peterson's] capabilities," it was "significantly at odds with [her] diagnoses." A.R. at 247. He also found that Peterson was able to achieve a "satisfactory maximum test effort" in only 6 out of 10 trials, a result that was "not . . . acceptable" and indicated the possible presence of "capabilities that exceed those demonstrated during the functional capacity evaluation." *Id.* Although "determination

10

of [Peterson's] exact current functional capabilities" was therefore difficult, McCoy concluded as follows:

> Based upon the Functional Capacity Evaluation completed, Ms. Linda Peterson appears capable of functioning generally within the sedentary work category as defined by the *Dictionary of Occupational Titles* (D.O.T.). This includes the occasional lifting, pushing/pulling or exertion of up to 10 lb force with negligible frequent or constant force expenditure. While Ms. Peterson has limitations due to pain and loss of strength with her right wrist and hand, unfortunately she has several areas of pain complaints that make it difficult to help delineate limitations with regard to her industrial injuries and other pain complaints. Based upon Ms. Peterson's current capabilities with respect to her industrial injuries, she would probably be limited to only occasional use of a computer keyboard/mouse, which in a normal day would be about 2 ½ hours of use. Additionally, this computer use should probably be partitioned throughout the course of her day and be generally non-production oriented in nature. Having the job autonomy capability to do other useful activities throughout the day would be beneficial for Ms. Peterson in helping her to return to some type of gainful employment. . . . Upon return to work, Ms. Peterson would benefit from ergonomic modifications to her work station to help maximize her productivity and comfort level, and may benefit as well from certain force magnifiers and adaptive devices as necessary, depending upon her specific job needs. Overall Ms. Peterson, unfortunately, is an individual who appears to have pain complaints, both related to her industrial diagnosis and unrelated to her industrial diagnosis, that limit her functional capabilities and performance and will probably have discomfort regardless of whether or not she returns to occupational activities related to her daily activities.

A.R. at 245.

The extent of Peterson's disability was then independently assessed by Leonard S. Bodell, M.D., on December 16, 2002. Based on the medical records and the October 14 functional capacity report, Bodell concluded that Peterson suffers from "mild tenderness over the first dorsal compartment" in her right hand, present but improved symptoms of carpal tunnel syndrome, a weakened grip, sensory loss, and significant pain in her pisotriquetral joint. A.R. at 232. He stated that Peterson "seemingly" had fibromyalgia, but that, if actually present, the condition was unrelated to Peterson's employment at FedEx. He also

believed that Peterson had developed carpal tunnel syndrome in her left hand as well as her right.  From these impressions Bodell described Peterson's capacity to work as follows:

> Even [when] we exclude the left hand and we exclude the potential diagnosis of Fibromyalgia, this patient is limited in her return to work from a job perspective at Fed Ex.  What she is limited to is a nonrepetitive job that is sedentary to light.  I concur with Dr. Campbell that infrequent lifting and carrying of short distances of objects weighing up to 10 pounds would not be unreasonable but her participation in a job that requires her to use a computer and mouse on a continuing basis without frequent breaks and alternative jobs throughout the day is inappropriate.  What will happen is she will probably get an aggravation of her underlying symptoms, perhaps an exacerbation of the other symptoms related to the Pisotriquetral joint and likely could begin to develop progressive symptoms in the left side as well.  I feel therefore that although she is, from the hand standpoint, potentially employable the jobs that she would be eligible to do in my opinion are things like reception, answering phones if she used a headset, but not in a situation in which she would have to use her hands in any frequent manner.
>
> Again, these statements are made to a degree of medical probability and are exclusive of any underlying diagnosis or limitations that may otherwise imposed [sic] because of issues related to her neck and shoulder girdle that might be characterized as being associated with Fibromyalgia.

A.R. at 233.

Peterson continued to see receive frequent medical attention in 2003.  On January 3, 2003, Pam L. Morris, C.A.N.P., found that Peterson had "all the classic tender points" for fibromyalgia, including the "occipital insertion site, low cervical, trapezius, supraspinatus, anterior chest wall, lateral epicondyles, gluteal fold, greater trochanters, and medial fat pad of the knees."  A.R. at 173.  Peterson was unable to exercise often because of the pain in her feet and neglected to do "home stretches" previously recommended by her physician.  *Id.* On January 7, she received facet joint injections containing lidocaine and the steroid Kenalog to reduce pain and inflammation in her neck and upper spine.  A.R. at 222.  The pain returned, however, after only a few days of relief.  A.R. at 221.  On March 5, 2003, Peterson reported that none of her treatments and medications were working.

12

1   Peterson next received a chriopractic exam from Keith Lavender, D.C., on April 1,

2   2003.  Lavender's neurological evaluation indicated that Peterson's cranial nerves were

3   "grossly intact," that she was "alert and oriented," that she had equal reflexes in all of her

4   extremities, that her sensation was intact, and that she could walk heel to toe without

5   difficulty.   A.R. at 215.   An accompanying spinal examination, however, showed

6   "dysfunctions/vertebral subluxations" in multiple locations along her spine accompanied by

7   joint edema, inflammation, muscle spasms, and muscle splinting and tenderness.  A.R. at

8   216.  Lavender's orthopedic examination further showed positive responses to a series of

9   maneuvers testing for the presence of lower limb disorders, nerve root compression, and

10  sacroiliac, foot, lumbar, and cervical lesions.  Radiographic tests corroborated the presence

11  of upper cervical subluxations and showed degenerative disc disease.  Lavender therefore

12  began a series of periodic spinal adjustments to reduce interference with Peterson's nervous

13  system. A.R. at 213. Peterson responded "well" to this care and was "able to find relief that

14  allows her improvement in her activities of daily living."  *Id.*

15  On August 22, 2003, Broadspire contracted Sheldon Zane, M.D., a rheumatologist,

16  to conduct a review of the medical record and provide a second opinion as to Peterson's

17  continuing eligibility for long-term occupational disability payments.  Reviewing Caldron's

18  office notes from April 18, July 1, and October 2, 2002, and January 3, March 3, May 9,

19  2003, in addition to an operation report dated January 7, 2003, and offices notes from Ortiz

20  dated November 4, 2002, November 12, 2002, and January 16, 2003, Zane concluded that

21  "the data submitted *does not* support a functional impairment that would render [Peterson]

22  unable to perform the essential duties of his/her own occupation as a Inside Sales

23  Representative that requires making customer sales calls and continuous typing."  A.R. at

24  295.

25  Caldron reached a different conclusion.   In an attending physician statement

26  completed on October 12, 2003, he explained that he was "unable to release" Peterson for

27  a return to employment and that he did not anticipate any significant clinical improvements

28

1  in her condition over time.  A.R. at 169.  Caldron explained that his conclusions were

2  supported by the following "objective data":  muscular tender points, a limited range of

3  cervical rotation, and an MRI test showing degenerative disc disease.  Caldron explained that

4  Peterson's work restrictions stemmed from chronic pain, an inability to focus on tasks, and

5  depression.  *Id.*

6      Continuing to encounter difficulty with pain and fatigue, Peterson subsequently

7  received an examination from Gary A. Smith, M.D., her new primary care physician, on

8  October 21, 2003.  Smith assessed that she suffered from osteoporosis, fatigue, fibromyalgia,

9  high cholesterol, and motion sickness.  Chest pain was reportedly absent, and massages

10  performed by Lavender reportedly helped to alleviate Peterson's discomfort.  Smith noted

11  continuing problems with fibromyalgia and fatigue over the course of numerous subsequent

12  examinations.

13      On November 12, Michael Habros, M.D., a board-certified rheumatologist, reported

14  that Peterson was in "moderate to severe distress because of pain."  A.R. at 165.  He

15  observed "pain on movement" throughout Peterson's spine, that her "FM [fibromyalgia]

16  Tenderpoints [were] all 3-4+/4 positive," and that her "hands [were] tender & painful."  *Id.*

17  His impression was that Peterson suffered from "spondylosis & [osteoarthritis of the cervical

18  and lumbosacral] spine, early [osteoarthritis in her] hands & wrists [and] . . . recurrent plantar

19  fasciitis."  *Id.*  Habros further concluded that Peterson suffered from "FMS [fibromyalgia]

20  active & fairly severe" and "severe fatigue."  *Id.*

21      An MRI of Peterson's brain subsequently performed by Michael Fucci, M.D., in

22  December 2003 revealed "[p]ersistent 1-cm left inferior frontal subcortical signal

23  abnormality and interval appearance of two right parietal subcortical and deep white matter

24  smaller signal abnormalities" that suggested "multifocal small-vessel ischemic change such

25  as seen with migraines, vasculitis, or age-related changes."  Doc. # 48, Exh. D at 1.  Another

26  MRI performed by William D. Grainger, M.D., on January 13, 2004, showed that Peterson's

27  brain was "essentially normal," with the possibility of a small venous angioma, a condition

28

14

that entails a tangle of abnormal veins in the brain, and a "labyrinthine abnormality" that Grainger "suspect[ed] . . . represents a variation of benign positional vertigo." A.R. at 220. Grainger scheduled vestibular therapy to treat Peterson's dizziness and improve her sense of balance.

### 3. Broadspire's First Denial of Long-Term Total Disability Coverage

On January 19, 2004, Broadspire notified Peterson that it was conducting a periodic review to determine her possible eligibility for total disability benefits upon the expiration of the two-year period of occupational disability payments in July 2004. Peterson was requested to submit medical records showing significant objective findings that substantiate her total disability under the Plan.

Peterson continued to receive medical attention during Broadspire's evaluation of her claim. In February and March 2004, she continued to report foot pain and an inability to sleep and was diagnosed with plantar fasciitis by Fucci. A.R. at 179-80. Fucci believed, however, that the condition would "resolve over the next year" and that Peterson was "[a]ble to return to full duty" at FedEx. A.R. at 218.

On March 24, 2004, Peterson began to receive additional physical therapy from Michael Stratton, P.T. Stratton's report indicates "subjective findings" of "insidious and progressive" injury to Peterson's foot and difficulty performing activities of daily living, getting in and out of the car, and balancing. A.R. at 207. Peterson reported that injections and orthotic devices provided no relief from her foot pain. Stratton's "significant musculoskeletal findings" included a valgus deformity at the knee with mild to moderate pronation, bony abnormalities in Peterson's hand, tight hip internal rotation, and pain on palpation of the plantar fascia. *Id.* From these observations, Stratton concluded that Peterson had "deficits in flexibility, strength, proprioception and function secondary to bilateral fibromyalgia and plantar fasciitis." A.R. at 208. He found that Peterson was motivated to rehabilitate and that her condition would improve with "stretching/strengthening modalities, progressive therapy and stability exercises." *Id.* An MRI of Peterson's knee subsequently

15

showed the presence of a popliteal cyst and "mild" chondromalacia patella, a condition involving damage to the cartilage under the kneecap.  A.R. at 101.

Peterson's condition improved measurably over the course of the next month of physical therapy.  Stratton repeatedly noted that she was "showing progress," and with only some exceptions Peterson generally reported that she was starting to feel better.  On April 17, 2004, Scott Arehart, P.T., reported that Peterson's average level of pain dropped from 6/10 to 4/10 as a result of the therapy and that she was "making relatively good progress." A.R. at 194.  However, additional therapy was recommended because Peterson continued to complain of persisting symptoms related to fibromyalgia, exhibited "deficits in her left dorsiflexion," and continued to report substantial foot pain.  A.R. at 191, 193-94.  Although Peterson became discouraged by a perceived lack of progress in late April, A.R. at 191, Arehart explained in a status report dated April 28 that the therapy had generated a 20% improvement in her condition since April 17.

In some tension with Arehart's findings, Habros reported to Broadspire in April 2004 that Peterson was "totally restricted" in her ability to work, that he was "unable to release" her for a return to employment, and that he was uncertain as to when Peterson's condition would improve.  A.R. at 159.  The "objective data" that supported these conclusions included "pain + [range of motion], [cervical] + [lumbosacral] spines, 2-3+/4 myalgia." *Id.*  Peterson also reported to Discont on April 30 that she continued to experience "lots of pain" in her feet.  A.R. at 178.

On May 20, 2004, Broadspire obtained a peer review of the medical record by physiatrist Eddie Sassoon, M.D.  Reviewing a host of records created by Peterson's multiple physicians between 2002 and 2004, Sassoon found that the "data submitted does not substantiate that a functional impairment exists that would preclude the claimant from engaging in any compensable employment for a minimum of twenty-five hours per week." A.R. at 290.  He placed particular emphasis on the reports from Peterson's brain and knee MRIs, the April 2002 report from Caldron, and unspecified 2004 records from Habros.

16

1   Sassoon concluded, "While the claimant does have a diagnosis of plantar fasciitis and

2   chronic foot pain, she should be able to perform activities that would not require constant

3   repetitive upper motion in a sedentary supportive position and therefore, she is not disabled

4   from any occupation."  A.R. at 291.

5          On the basis of a similar records review for Broadspire, rheumatologist Sheldon Zane

6   also found that the "data submitted does not substantiate that a functional impairment exists

7   that would preclude the claimant from engaging in any compensable employment for a

8   minimum of twenty-five hours per week."  A.R. at 293.  Like Sassoon, Zane placed emphasis

9   on the brain and knee MRI test results, in addition to the attending physician statement from

10  Habros, the December 2002 independent medical assessment of Bodell, and the functional

11  capacity evaluations from October and November 2002.  Those records were viewed as

12  indicia that Peterson "is able to perform at a sedentary occupation," so long as the occupation

13  involved "no heavy lifting, no prolonged standing/walking, a minimum of repetitive

14  motions," and an "ability to change positions ad lib and take reasonable breaks and . . .

15  function in an ergonomic work place."  A.R. at 294.

16         In light of the reviews from Sassoon and Zane, Broadspire determined on June 4,

17  2004, that Peterson failed to qualify for long-term total disability payments.  This decision

18  substantially relied on the functional capacity evaluations performed on October 14, 2002,

19  and November 15, 2002, both of which Broadspire construed to indicate an ability to perform

20  sedentary work.  Broadspire also emphasized notes from the neurological consultation with

21  Grainger on January 13, 2004, the report from the MRI of Peterson's knee, and notes from

22  her visit with Habros on April 21, 2004.  The "documentation submitted," Broadspire

23  explained, "[did] not demonstrate objective evidence of a functional impairment of sufficient

24  intensity and severity as to preclude [Peterson] from performing any compensable

25  employment for a minimum of twenty-five hours per week."  A.R. at 13.

26

27

28
                                         17

1

### 4.    Peterson's Appeal

2      Peterson continued to receive medical care after the initial denial of long-term total

3 disability benefits. On June 17, 2004, she explained to Smith that she suffered from vertigo

4 and fatigue and felt unable to work due to her carpal tunnel syndrome. Smith's assessment

5 noted problems with fibromyalgia, carpal tunnel syndrome, plantar fasciitis, vertigo, and

6 depression. A.R. at 61. X-rays showed "mild" degenerative changes in the cervical,

7 thoracic, and lumbosacral regions of Peterson's spine, "mild bilateral hallux vulgus

8 deformities," and "flattended distal aspect of the right 2nd metatarsal" in Peterson's foot.

9 A.R. at 71-74, 100. Based on Peterson's complaints of headaches, light sensitivity, facial

10 twitching, dizziness, neck and joint pain, fatigue, difficulty sleeping, and parasthesisas,

11 Grainger found on July 29 that she suffered from a "transformed migraine." A.R. at 133.

12 Depakote and Imitrex were prescribed to treat this condition, but those medications were

13 subsequently reported as only moderately effective. A.R. at 135. On August 19, Ortiz

14 examined Peterson and found that she "appear[ed] in no acute distress," but also

15 demonstrated a restricted range of motion in her neck and upper cervical spine and "diffuse

16 myofascial symptoms across the suboccipital region, along the cervical paraspinous and

17 periscapular muscles." A.R. at 130. Terry D. Fife, M.D., found on August 26 that Peterson

18 suffers from phobic postural vertigo, migraine headaches, depression, and diffuse body aches

19 and pains secondary to fibromyalgia. A.R. at 137. Smith noted on September 10 that

20 Peterson "has had no improvement" in her migraines and fibromyalgia and "continues to be

21 disabled." A.R. at 59.

22      Peterson collected extensive supplementary information to challenge Broadspire's

23 denial of long-term total disability coverage. A functional capacity evaluation performed by

24 Richard S. Randall, P.T., indicated that Peterson is unable to "perform tasks even at the

25 sedentary work level due to all of her restrictions and deficits, even on a part time basis."

26 A.R. at 32. This finding was based on several observations. First, in a P.A.C.T. Spinal

27 Function Sort survey that measures ability to function with respect to 50 activities of daily

28

living, Peterson scored between the 25th and 50th percentile for unemployed, disabled females, a result that Randall interpreted as "below a sedentary RPC." A.R. at 34. Second, although Peterson was cooperative and appeared comfortable during the first 30 minutes of the evaluation, she also demonstrated dizziness leading to loss of balance, below average coordination skills, difficulty concentrating on complex tasks, poor body mechanics for lifting, pushing, pulling, and carrying activities, limited ambulatory status, limited usage of upper extremities, and limited static work activities in completing Randall's program of diagnostic exercises. Randall further found that Peterson had limited cervical, shoulder, and lumbar mobility; weakness in her upper extremities, pelvis, and grip; limited capacity for ambulatory and stair-climbing activity due to weakness and balance problems; and limited capacity for activities such as squatting, kneeling, and crouching. He explained that Peterson is "essentially unable to perform any job task at this time, not only due to weakness, structural instability, loss of balance and difficulty with following any complicated directions with coordinated activities, especially alternating motions, and any tasks that require sequencing." A.R. at 37.

Peterson also obtained multiple letters from her treating physicians. A September 13, 2004 letter from Smith stated that Peterson is "unable to sustain full time employment at this time." A.R. at 43. Attached to this document was a residual functional capacity form indicating that, in Smith's view, Peterson is unable to sit for more than 20 minutes at a time or 3 total hours per day, unable to stand for more than 10 minutes at a time or one total hour per day, and unable to walk for more than 5 minutes at a time or 40 minutes total per day. Peterson could "occasionally" lift items weighing 0-5 pounds, but "very seldom" carry items of any weight or lift items weighing more than 5 pounds. A.R. at 45. Peterson was also described as unable to use her hands for more than "2 ½ hours out of an 8 hour" work period and "very seldom" able to climb stairs, bend, stoop, crouch, kneel, or crawl. *Id.* Smith further explained that Peterson cannot use her hands for "repetitive work-related activities" such as grasping, pushing and pulling, and fine manipulations, and cannot use her feet for

19

1    "repetitive operation of foot controls."  *Id.*  Peterson is "totally" restricted from engaging in

2    work activities involving "unprotected heights," "being around moving machinery,"

3    "exposure to marked changes in temperature and humidity," and "exposure to dust, fumes,

4    and gases."  A.R. at 46.  Smith specified that the medical basis for his conclusions included

5    Peterson's "severe" pain, "moderately severe" fatigue, "moderately severe" inability to deal

6    with stress, and complete inability to concentrate on tasks for substantial periods.  *Id.*

7    Peterson's conditions would require her to miss approximately 50% of a standard work

8    schedule, alternate between sitting and standing every 15 minutes, and take breaks every 45-

9    60 minutes.  A.R. at 47.

10           A "Headaches Residual Functional Capacity Questionnaire" attached to Smith's letter

11   described the nature and effect of Peterson's migraines.  Smith stated that Peterson has daily

12   headaches that last approximately "90% of [the] day."  A.R. at 50.  The headaches are

13   exacerbated by bright lights, movement, noise, and coughing and often triggered by such

14   diverse factors as alcohol, hunger, lack of sleep, stress, weather changes, and vigorous

15   exercise.  Smith further explained that the "objective signs" of Peterson's headaches include

16   tenderness, impaired sleep, X-rays, and MRI test results, and that when the headaches occurr

17   Peterson would "generally be precluded from performing even basic work activities."  A.R.

18   at 52.  In another letter dated September 16, Smith indicated that Peterson's "chronic back

19   pain . . . does not allow her to work" and that physical therapy had proven ineffective.  A.R.

20   at 41.

21           Habros wrote a similar letter stating that "Mrs. Peterson is totally disabled re:

22   employability at this time and in the foreseeable future and is functionally limited to self care

23   and minimal light home duties, assisted by her husband."  A.R. at 81.  The basis for this

24   conclusion was that Peterson "has severe muscle pain and tenderness in all her muscles,"

25   "severe fatigue and fatigability," poor memory, and an inability to sleep well or concentrate.

26   *Id.*  A residual functional capacity form attached to the letter indicated findings nearly

27   identical to those provided by Smith, including a finding that Peterson's condition "meets the

28                                                    20

1990 ACR criteria for the diagnosis of fibromyalgia" and that she would be unable to work

without missing approximately 75% of a standard work schedule.  A.R. at 85.

Another letter from Lavender expressed concurrence with Randall's functional

capacity report.  Lavender assessed Peterson's ability to return to work as follows:

> In respect to whether I believe she is able to sustain full time work in any occupation at the present time, I would have to defer to Mr. Randall's report and say that she probably will have difficulty performing any work related labors.  Although the word "any" is so wide and general in application it can be conceived that she would be able to do some type of work given the right circumstances and work load.  As noted in Mr. Randall's report, the ability to work and perform tasks is one thing, while the ability to do it well without mistakes and in a useful, marketable manner is quite another.

A.R. at 103.

Questionnaires completed by Habros, Lavender, Kenneth Muhich, D.C., and Smith

also supported the view that Peterson is disabled.  Each of these physicians reported that, in

light of the language of the Plan, the medical records contain "significant objective findings"

consistent with the presence of functional impairment.  These findings were identified as

including the x-ray taken on June 29 that showed degenerative changes in Peterson's spine,

fibromyalgia tender points, polyarticular arthritis, and reduced range of motion in Peterson's

cervical and lumbar spines.  Each physician concluded, moreover, that the objectively

demonstrated conditions contributed to Peterson's inability to work in any occupation.  A.R.

at 54-56, 87-89, 105-07, 115-17.

John J. Komar, Ph.D., a vocational rehabilitation counselor, similarly concluded on

November 3, 2004, that Peterson is "not employable."  A.R. at 141.  In Komar's view,

Peterson "has not sufficiently recovered from her many physical limitations to qualify for any

type of occupation with which [he is] familiar."  *Id.*  Komar found after several months of

counseling that Peterson was sincere in professing a desire to return to work, but was

nevertheless precluded from doing so by pain and difficulties with balancing, bending,

climbing, kneeling, lifting, sitting, squatting, standing, and walking.

21

Affidavits from Peterson's friend and daughters also expressed that she is unable to work. Carolyn M. Allendorf states that Peterson stopped coming to monthly social gatherings since the onset of her health problems. A.R. at 144. Peterson's three daughters each explain that she is unable to sit, stand, or walk for more than 10 to 15 minutes without changing positions due to pain, that she exhibits difficulty paying attention, and that she is always exhausted. A.R. at 150. They also state that Peterson limps because of her plantar fasciitis, requires frequent breaks due to fatigue and dizziness, and cries often and expresses feelings associated with depression. A.R. at 150-58.

Armed with these additional documents, Peterson appealed the denial of long-term disability benefits on November 30, 2004. The newly obtained letters and affidavits were sent to FedEx on December 1, 2004. Broadspire confirmed its receipt of the records on December 7.

**5.    Broadspire's Recommendation to Deny Long-Term Total Disability Coverage**

To evaluate Peterson's appeal, Broadspire obtained three additional physician reviews of the medical record. The first reviewer, neurologist Vaughn D. Cohan, M.D., noted Peterson's diagnoses of migraines, vertigo, degenerative disc disease, plantar fasciitis, fibromyalgia, carpal tunnel syndrome, and chronic pain syndrome. However, Cohan found that the "clinical documentation" did not "reveal a functional impairment that would preclude [Peterson] from engaging in any compensable employment for a minimum of twenty-five hours per week." A.R. at 299. In reaching this conclusion, Cohan dismissed the findings in Randall's July 2004 functional capacity evaluation for several reasons. First, although Randall recorded problems with dizziness, below average coordination skills, and limited ambulatory status, Cohan found those problems to be "inconsistent with the reported physical exam findings" recorded by Peterson's neurologist and neuro-otologist "in recent months." A.R. at 300. Second, although Randall's report also noted that Peterson's has below-average "fingering and handling capabilities" and "limited truncal and appendicular mobility and

weakness," those findings would not "preclude work in a sedentary occupation on a part-time basis." *Id.* Third, although Randall stated that Peterson encountered difficulty concentrating on multiple tasks, Cohan found that there were "no objective reports demonstrating or substantiating that [Peterson] has any impairment in cognitive functionality." *Id.* Finally, Cohan noted that Randall's report was generally unpersuasive because it did not include "any raw data as would be expected in a reliable, comprehensive, functional capacity evaluation." *Id.* Randall's impressions, Cohan found, "are poorly supported or not supported at all by relevant, objective, supporting data." *Id.*

Cohan also examined Peterson's orthopedic and chiropractic records, but found them unsupportive of the disability claim. Documents completed by Ortiz were described as indicating that Peterson had a restricted range of motion of her cervical spine, restricted lumbar extension, and diffuse myofascial symptoms. Cohan emphasized, however, that Ortiz found Peterson to be "in no obvious distress" on January 16, 2003, and that Ortiz believed that "psychological stressors" might be causing Peterson to somatize. A.R. at 300. The opinions of Peterson's chiropractors were rejected as unsupported by objective data.

Cohan also dismissed the findings contained in Smith's records. The conclusion that Peterson is unable to work was rejected because Smith's own functional capacity evaluation indicates that Peterson can sit up to three hours per day, stand up to one hour per day, and walk up to 40 minutes per day. Those abilities, Cohan explained, "would certainly be consistent with performance of a sedentary occupation." A.R. at 300. Although in Smith's estimation Peterson also required several hours per day in a "reclining posture," that posture "could certainly be performed after work activities, particularly if [Peterson] were required to work only five hours per day." *Id.* Peterson's reportedly limited ability to lift and carry was also no obstacle because a "typical sedentary occupation would not have significantly difficult requirements" with respect to those activities. *Id.* Cohan rejected Smith's conclusions that Peterson cannot perform repetitive activities with her right hand and that she

1    cannot work without frequent rest breaks because those findings were not supported by

2    "objective documents." *Id.*

3         Habros's findings of disability were similarly unpersuasive to Cohan. Habros's letter

4    explaining that Peterson is totally disabled due to fibromyalgia, severe muscle pain, severe

5    fatigue, poor sleep, and an inability to focus was insufficient because "there have been no

6    objective reports of cognitive dysfunction by treating physicians, and especially neurology."

7    A.R. at 301. "While [Peterson] may have fatigue and positive tender points," Cohan opined,

8    "it has not been firmly established that these are of sufficient severity and/or intensity as to

9    preclude her from performing a sedentary occupation on a part-time basis." *Id.* Habros's

10   diagnosis of polyarticular arthritis was similarly rejected because the imaging tests revealed

11   only "mild" degenerative changes in Peterson's back and "mild" deformity in her foot.

12   Cohan dismissed the significance of Habros's functional capacity evaluation on the ground

13   that the evaluation was not substantiated by the medical record.

14        Cohan next found that the conclusions of Caldron, Grainger, Fife, Fucci, and Komar

15   also failed to support a determination of disability. Caldron's examination on April 18, 2002,

16   was described as revealing the absence of peripheral synovitis or swelling over the surgical

17   incision made in Peterson's right wrist, and as revealing that Peterson had a full range of

18   motion of the hands, wrists, elbows, and shoulders. Although Caldron's attending physician

19   statement indicated that Peterson was unable to work due to depression and an inability to

20   focus, Cohan dismissed that conclusion because "there is no objective documentation of a

21   cognitive impairment which would preclude work, and there are no reports by behavioral

22   health practitioners indicative of depression to an extent that the claimant would be unable

23   to work." A.R. at 301.

24        In Cohan's view, the other records failed to indicate disability for a number of

25   reasons. The brain MRI performed by Fucci in December 2003 "revealed no significant

26   abnormalities other than white matter changes consistent with migraine syndrome," and

27   while Grainger subsequently noted Peterson's dizziness in January 2004, he did not describe

28

1   it as "true vertigo." *Id.* "Electronystagmography . . . revealed a mild peripheral abnormality

2   with no evidence of central vestibular dysfunction," but Grainger's "neurologic exam

3   revealed [Peterson] to be alert and oriented x3 with clear speech, appropriate content, and

4   grammar." *Id.* Cohan also emphasized that, in Grainger's view, "sensory testing, motor

5   examination, deep tendon reflexes, and cerebellar testing were all within normal limits." *Id.*

6   Fife was described as finding Peterson to be "cognitively intact and appropriate, although

7   somewhat depressed." *Id.* According to Cohan, Fife did conclude that Peterson has "phobic

8   postural vertigo . . . migraine headaches, generalized anxiety and depression, possible

9   eustachian tube dysfunction, and body aches and pains secondary to fibromyalgia," but the

10  "remainder of the neurologic examination was within normal limits." *Id.* Also significant

11  to Cohan was the fact that neither Grainger nor Fife "made any comments indicating that

12  [Peterson] could not work." A.R. at 302. Fucci's attending physician statement, moreover,

13  "indicated that [Peterson] could return to full duty" and that "her symptoms would resolve

14  over time." *Id.* Although Komar stated that Peterson could not in fact return to work, Cohan

15  rejected that statement as unpersuasive because Komar did not "provide any objective

16  documentation or evidence of an independent medical examination." *Id.*

17       Broadspire's second reviewer, rheumatologist Yvonne Sherrer, M.D., also found that

18  Peterson was ineligible for long-term total disability coverage. The definition of "total

19  disability" that she utilized in making that determination focused on whether Peterson's

20  "functional ability was severe enough to render [her] incapable of performing any

21  occupation." A.R. at 305. Sherrer dismissed Randall's functional capacity evaluation and

22  finding of disability for lack of objective, supporting evidence. Sherrer emphasized that

23  "neurological exams have not documented significant weakness," that no physical

24  examination documented structural instability, and that no neuropsychological evaluation

25  documented a cognitive impairment that would render Peterson unable to follow directions.

26  Sherrer also noted that Randall failed to identify the objective performance scales by which

27

28

1  he measured Peterson's abilities and that his conclusions "conflict[ed] with the physical
2  exam information found elsewhere."  A.R. at 306.

3      To Sherrer, records from Smith and Ortiz also failed to document total disability.
4  Smith's letter stating that chronic back pain prevents Peterson from working was
5  unsupported by "objective documentation," and imaging tests from July 2004 showed "only
6  'mild degenerative changes'" in Peterson's spine.  A.R. at 306.  Ortiz's evaluations were
7  described as finding "no significant abnormalities apart from slight to moderate restrictions
8  in range of motion predominantly of the cervical spine."  *Id.*

9      Broadspire's third and final reviewer, orthopedic surgeon Ira Posner, M.D., also found
10 insufficient objective evidence of total disability.  Posner noted Campbell's diagnoses of
11 carpal tunnel syndrome, de Quervain's tenosynovitis, and a volar wrist ganglion, in addition
12 to Discont's diagnosis of plantar fasciitis.  He also recounted Caldron's diagnoses of
13 fibromyalgia and degenerative spinal changes; Ortiz's observation of restricted range of
14 motion and diagnoses of cervical facet syndrome, TMJ, fibromyalgia, and cervical
15 spondylosis; and Ostransky's observation of restricted range of motion and muscle
16 tenderness.  According to Posner, none of those reported diagnoses and observations were
17 supported by objective medical evidence.

18     Posner also emphasized that the functional capacity evaluations by Williams and
19 McCoy indicated that Peterson could sustain sedentary employment.  Although McCoy
20 found that Peterson should limit her computer usage to no more than 2.5 hours, Posner read
21 McCoy's report to mean that Peterson "could participate in work activity at the sedentary
22 level."  A.R. at 311.  Bodell's evaluation also showed that Peterson "could do sedentary work
23 activity as long as she did not do repetitive work involving her right upper extremity."  A.R.
24 at 312.

25     Posner concluded that subsequent evaluations and testing by Peterson's physicians
26 similarly failed to support a determination of disability.  MRIs "did not show any significant
27 abnormalities."  A.R. at 312.  Grainger, it was emphasized, found that Peterson was in "no

28

acute distress," and he supplied "no evidence of any motor or sensory loss in upper or lower extremities." *Id.* Randall's functional capacity evaluation was unpersuasive for lack of objective support, because it was inconsistent with the rest of the medical record, and because "a lot of the activity . . . was . . . self-limited by the claimant." A.R. at 312. Fife's examination in August 2004, moreover, showed that Peterson was "cognitively intact" and without neurological deficit. A.R. at 313. Smith's conclusion that back pain prevented Peterson from returning to work, Posner continued, contradicted imaging tests showing only mild spinal degeneration. The various letters submitted by Muhich, Lavender, Smith, and Habros were not supported by "any substantial documentation," and Komar's assessment was "based more on subjective complaints than objective documentation." *Id.* Although Peterson's medications are known to cause dizziness and fatigue, Posner explained that those effects subside over time and thus should not inhibit Peterson's ability to work.

In light of the reviews of Cohan, Sherrer, and Posner, Broadspire recommended that FedEx uphold the initial denial of long-term total disability coverage. A.R. at 9. Broadspire sent the reviews, along with Peterson's medical records, to FedEx for a final benefits determination on December 27, 2004.

**6.    FedEx's Final Denial of Coverage**

On January 5, 2005, FedEx's Benefits Review Committee met to evaluate Peterson's eligibility in light of the record. The minutes from that meeting indicate that Committee members Andy Nix, Billy Willard, Bill Robbins, and Cathy Bowsher were all present, and that the Committee voted to uphold Broadspire's determination.

FedEx communicated its January 5 decision to Peterson on May 5, 2005. The decision letter, which was signed by Nix, stated that, after "review[ing] all information presented," long-term disability benefits were denied because Peterson "did not meet the definition of Total Disability" under the Plan. A.R. at 3. The Committee "noted Ms. Peterson's diagnoses of fibromyalgia, carpal tunnel, plantar fasciitis, vertigo, degenerative disc disease, and headaches," but found that "there were no objective findings that would

1  preclude [Peterson] from engaging in any compensable employment for 25 hours per week."

2  A.R. at 5.  In support of this decision, the decision letter recounted in detail the peer reviews

3  provided by Sassoon, Zane, Cohan, Sherrer, and Posner.  The letter also noted that Peterson's

4  prior receipt of Social Security disability benefits was inconsequential to FedEx's benefits

5  determination because the "criteria utilized by the Social Security Administration . . . are

6  different from the stricter definition for Total Disability set forth in the [FedEx] Plan."  A.R.

7  at 5.  Peterson was not notified of or given an opportunity to respond to the reviews of

8  Cohan, Sherrer, and Posner prior to receiving FedEx's final decision.

9      Peterson now appeals the Committee's decision to this court under 29 U.S.C. §§

10  1132(e)(1) and 1132(f).  The Complaint alleges that the denial of benefits was improper

11  under the Employee Retirement Income Security Act ("ERISA").  Both parties move for

12  summary judgment under Federal Rule of Civil Procedure 56.

13  **II.  *Abatie* Review**

14      Typically, summary judgment is appropriate where there is no "genuine dispute of

15  material fact."  Fed. R. Civ. P. 56(c).  "In ERISA actions, however, where the plaintiff is

16  challenging the plan administrator's denial of benefits . . . 'a motion for summary judgment

17  is merely the conduit to bring the legal question before the district court and the usual tests

18  of summary judgment, such as whether a genuine dispute of material fact exists, do not

19  apply.'"  *Farhat v. Hartford Life & Accident Ins. Co.*, 439 F. Supp. 2d 957, 966 (N.D. Cal.

20  2006) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)).

21      A claims determination under an employee benefits plan governed by ERISA is by

22  default subject to de novo review.  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th

23  Cir. 1999).   However, where the plan "unambiguously provide[s] discretion to [its]

24  administrator" to interpret the terms of the plan and make final benefits determinations, the

25  determination is reviewed for an abuse of discretion.  *Abatie v. Alta Health & Life Ins. Co.*,

26  458 F.3d 955, 963 (9th Cir. 2006).  "The plan administrator bears the burden of showing the

27

28

1  plan gives it discretionary authority."  *Ondersma v. Metro. Life Ins. Co.*, 2006 U.S. Dist.

2  LEXIS 85460, at *2 (N.D. Cal. Nov. 16, 2006).

3      If plan language warrants de novo review, "[t]he court simply proceeds to evaluate

4  whether the plan administrator correctly or incorrectly denied benefits" in light of all the

5  evidence.  *Abatie*, 458 F.3d at 963.  However, if the language of the plan triggers review for

6  an abuse of discretion, three stages of analysis will remain.  First, it must be determined

7  whether the administrator in fact exercised its plan-authorized discretion in the course of

8  denying the benefits.  If the administrator did not, the denial may be reviewed de novo.  *Id.*

9  at 972.

10     Second, if the administrator both possessed and actually exercised discretion in

11  denying benefits, the precise level of scrutiny with which to review the denial must then be

12  determined.  A denial of benefits should be reviewed with greater scrutiny if a plan gives

13  discretion to an administrator that has a structural conflict of interest due to its status as both

14  administrator and funding source.  *Id.* at 965.  Other factors to consider in determining the

15  appropriate level of scrutiny include evidence of malice, self-dealing, "a parsimonious

16  claims-granting history," inconsistent reasons for denial, inadequate investigation into a

17  claim, failure to credit a claimant's reliable evidence, a history of denying "benefits to

18  deserving participants by interpreting plan terms incorrectly or by making decisions against

19  the weight of evidence in the record," and procedural irregularities.  *Id.* at 968, 972.  Unlike

20  de novo review, review for an abuse of discretion is generally limited to the administrative

21  record before the plan administrator at the time of its decision.  *Id.* at 970.

22     Finally, after determining the appropriate level of scrutiny, that scrutiny must be

23  utilized in deciding whether the administrator actually abused its discretion in denying

24  coverage.  An ERISA plan administrator abuses its discretion if (1) it renders a decision

25  without any explanation, (2) it construes provisions of the plan in a way that conflicts with

26  the plain language of the plan, or (3) it relies on clearly erroneous findings of fact in making

27  the benefits determination.  *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472-73

28

1   (9th Cir. 1993). "The mere fact that the plan administrator's decision is contrary to some

2   evidence in the record does not show that the decision is clearly erroneous." *Snow v.*

3   *Standard Ins. Co.*, 87 F.3d 327, 331 (9th Cir. 1996). Rather, "review under the clearly

4   erroneous standard is significantly deferential, requiring a definite and firm conviction that

5   a mistake has been committed." *Id.*

6           **A.**    **The Standard of Review is Abuse of Discretion**

7           Peterson argues that de novo review applies because the Plan does not mention

8   Broadspire, let alone empower the company with discretionary decisionmaking authority.

9   The argument, which was made exclusively in Peterson's sur-reply to FedEx's cross-motion

10  for summary judgment, is unpersuasive. The relevant question is not whether the Plan

11  confers discretionary authority on Broadspire, but instead whether it confers that authority

12  on FedEx, the administrator of the Plan and ultimate arbiter of eligibility for benefits. *See*

13  *Abatie*, 348 F.3d at 965 (applying the abuse-of-discretion standard because the plan

14  "bestow[ed] on the *administrator* the responsibility" to interpret terms and determine

15  eligibility) (emphasis added); A.R. at 403 (providing that "Administrator shall mean the

16  Company, which is charged with the administration of the Plan, acting through its Employee

17  Benefits Department"); A.R. at 405 (defining the "Company" as "Federal Express

18  Corporation").

19          Looking therefore to whether the Plan confers discretionary authority on FedEx, it is

20  apparent that the proper standard of review is abuse of discretion. The Plan states

21  unambiguously that FedEx has the "absolute right and power to construe and interpret the

22  provisions of the Plan," determine eligibility for coverage, and decide the "amount, manner

23  and time" of payment. A.R. at 458-59. The Plan also provides FedEx's Benefits Review

24  Committee with authority to "interpret the Plan's provisions," subject only to judicial

25  scrutiny under the "arbitrary and capricious" standard of review. A.R. at 453.

26          Peterson's citation to *Teplick v. Boeing Company Employee Health and Welfare*

27  *Benefit Plan*, 2004 U.S. Dist. LEXIS 8748 (D. Ore. May 11, 2004), does not warrant a

28                                           30

contrary result.  In that case, the employer contracted for a third-party insurance company to both underwrite and administer the plan under which benefits were disputed.  The insurance company therefore handled all aspects of the plaintiff's claim and made the final decision to deny coverage.  It was held that de novo review applied because no language in either the plan or the summary plan description conferred discretion upon the insurance company as the administrator.  *Id.* at *23.  In contrast to the plan in *Teplick*, the present Plan unambiguously confers discretion on its administrator, FedEx.  *See* A.R. at 453, 458-59.

### B.    FedEx Exercised Discretion

Moving to the second stage of analysis under *Abatie*, the court finds that FedEx actually utilized its plan-authorized discretion in making the final decision to deny benefits on January 5, 2005.  The Benefits Review Committee came to the conclusion that benefits should not be awarded in light of the peer reviews performed by the Broadspire physicians.  That decision was not preordained by any categorical rule, but rather was the product of the Committee's consideration of the particular facts of Peterson's case.  Even assuming that Broadspire did not possess or exercise discretion in making the initial benefits determination, the final decision of the Benefits Review Committee was in fact discretionary.  That is enough to avoid de novo review.

### C.    A Moderate Level of Scrutiny is Warranted

Peterson contends that FedEx's decision should be closely scrutinized even if it is reviewed for an abuse of discretion because FedEx (1) failed to communicate its decision in a timely fashion, (2) operated under a structural conflict of interest, (3) failed to disclose its reliance on the reports of Cohan, Sherrer, and Posner until after the final decision was rendered and thereby deprived Peterson of an opportunity to respond, (4) expressed inconsistent reasons for denying benefits, (5) failed to conduct a full investigation by choosing not to obtain an independent medical evaluation, and (6) failed to credit reliable evidence of disability.  For the reasons stated below, a moderate level of scrutiny will be

31

applied because FedEx failed to communicate its decision in a timely fashion and failed to credit various reliable evidence of disability.

### 1.   Untimely Notice of Decision

Approaching Peterson's arguments in order, this court has already held that FedEx failed to communicate its final decision in a timely fashion.  *See Peterson v. Fed. Express Corp. Long Term Disability Plan*, 2006 U.S. Dist. LEXIS 34343, at *8 (D. Ariz. May 24, 2006).  ERISA regulations required FedEx to give notice of its January 5, 2005 denial of benefits "as soon as possible, but not later than 5 days after the [decision was] made."  29 C.F.R. § 2560.503-1(i)(3)(ii).  Notice was not given, however, until May 5, 2005, a full four months later.  This procedural irregularity warrants a minimally higher level of scrutiny within the abuse-of-discretion standard.  *Abatie*, 458 F.2d at 972.

FedEx argues that although the belated notice of decision violated ERISA regulations, *Peterson* definitively established that the violation has no effect on the standard of review because it was less than "flagrant."  2006 U.S. Dist. LEXIS 34343, at *20.  This argument misapplies the law of collateral estoppel.  A court may reexamine a prior legal determination in light of a "significant" intervening change in the law notwithstanding the traditional restrictions of collateral estoppel.  *Steen v. John Hancock Life Ins. Co.*, 106 F.3d 904, 914 (9th Cir. 1997).  *Abatie* significantly altered the law of ERISA in the Ninth Circuit by replacing the prior, binary standard-of-review framework with a sliding scale that shows less deference toward an administrator's decision as the indicia of bias proliferate.  Because *Abatie* was issued after *Peterson*, the court may now hold that the procedural irregularity identified in *Peterson* alters the form of abuse-of-discretion review notwithstanding the limited legal effect of the violation under the law before *Abatie*.

FedEx also appears to contend that the belated notice should not trigger higher scrutiny because there is an insufficient evidentiary basis for concluding that the notice was in fact untimely.  This argument is also unpersuasive.  The record makes clear that notice of

1    the Committee's decision was not given until four months after the decision was made, and

2    FedEx has offered no explanation to justify that delay.

3                    **2.    Conflict of Interest**

4            Typically, a structural conflict of interest is present, and a higher degree of scrutiny

5    is warranted, when the administrator of an employee benefits plan also operates as the

6    funding source. *See Abatie*, 458 F.3d at 965. This conflict is "inherent" and generally must

7    be given some weight "even if merely formal and unaccompanied by indicia of bad faith"

8    because it creates an "incentive to pay as little in benefits as possible to plan participants."

9    *Id.* at 966. The "less money the insurer pays out, the more money it retains in its own

10   coffers." *Id.*

11           An administrator may obviate a structural conflict of interest, however, by arranging

12   for benefits to be paid from a trust fund rather than directly from corporate coffers. *Pinto v.*

13   *Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378-79 (3d Cir. 2000); *Abnathya v.*

14   *Hoffmann-La Roche Inc.*, 2 F.3d 40, 45 n.5 (3d Cir. 1993); *Nobel v. Vitro Corp.*, 885 F.2d

15   1180, 1191 (4th Cir. 1989). Benefits trusts have been held to sufficiently dilute structural

16   conflicts of interest in ERISA cases even when the trusts are funded by the administrator and

17   parsimonious claims-granting would help to preserve trust assets. *Id.*; *Abnathya*, 2 F.3d at

18   45 n.5. The stated rationale for this rule is that an administrator that utilizes a trust

19   encounters no significant incentive to deny benefits because it "incurs no direct expense" as

20   a result of distributions from trust assets. *Id.* The court is somewhat skeptical that the use

21   of a trust fully obviates any conflict of interest. An administrator must be aware, for

22   example, that systematically generous claims determinations would deplete trust assets in a

23   way that requires more substantial annual contributions to sustain the trust balance.

24   However, to the extent that bias may remain despite the use of a trust, the cases have

25   uniformly found it insufficient to affect the level of scrutiny applied to benefits

26   determinations. The court follows this precedent.

27

28
                                        33

1      Peterson's argument that Broadspire's bias nevertheless infected the evaluation of her

2   claim is also rejected because the evidence of Broadspire's bias is inadequate.  The company

3   advertises that its "end result is a commitment to treat client's [sic] money like it is our own

4   and an ability to close claims faster with better results," Doc. # 48, Exh. A at 3, and that it

5   "saved customers six business days and $825 per short-term disability case in 2005," *id.* at

6   1.  However, such language cannot be read to necessarily suggest the presence of bias.

7   Broadspire could have simply been suggesting, for example, that it carefully evaluates claims

8   to make sure that benefits are not awarded when they are unwarranted.  The company may

9   have also been suggesting that its process for reviewing claims eliminates unnecessary

10  inefficiencies, or utilizes physician consultants that are better qualified than those contracted

11  by other similar firms, or operates on evaluation schedules that are more condensed than

12  those of its competitors.  While Peterson's interpretation is also plausible, *see Davis v.*

13  *Broadspire Servs., Inc.*, 2006 U.S. Dist. LEXIS 86993, at *4 n.1 (E.D. Pa. Dec. 1, 2006),

14  there is no basis for accepting it as authoritative.

15      Peterson also offers as evidence of a conflict of interest the reports provided by the

16  Broadspire reviewers who uniformly rejected her claim, citations to approximately twenty

17  cases in which the same reviewers rejected other employee claims, and interrogatories

18  indicating that the reviewers both received payment for their services and examined

19  anywhere from 109 to 1,060 cases in 2002.  The evidence is unpersuasive.  The mere critical

20  examination and ultimate rejection of Peterson's claim by the Broadspire physicians does not

21  logically demonstrate a conflict of interest.  Peterson's position would warrant heightened

22  scrutiny every time a claim is denied, however lacking in merit it may be.  Nor does the

23  reviewers' rejection of claims in several reported cases demonstrate bias.  The vast majority

24  of claims do not become the subject of litigation, so the cases are unlikely to be a

25  representative sampling, particularly if one considers that litigated benefits decisions are

26  generally more likely to involve close questions.  Most of Peterson's cited cases were even

27  decided in favor of the plan administrator's denial of benefits.  *See Semien v. Life Ins. Co.*

28
                                              34

*of N. Am.*, 436 F.3d 805, 815-16 (7th Cir. 2006); *McGruder v. Eaton Corp. Short Term Disability Plan*, 2006 U.S. Dist. LEXIS 80033, at *38 (D.S.C. Oct. 23, 2006); *Bennett v. Kemper Nat'l Servs.*, 2006 U.S. Dist. LEXIS 71792, at *20 (E.D. Mich. Sept. 29, 2006); *Surrett v. S. W. Corp.*, 2006 U.S. Dist. LEXIS 71015, at *16 (N.D. Okla. Sept. 29, 2006); *Johnson v. Bellsouth Long Term Disability Plan*, 2006 U.S. Dist. LEXIS 51185, at *45 (M.D. Fla. July 26, 2006); *Sarlo v. Broadspire Servs.*, 439 F. Supp. 2d 345, 363 (D.N.J. 2006); *Weidner v. Fed. Express Corp.*, 2006 U.S. Dist. LEXIS 27817, at *26 (D. Minn. May 9, 2006); *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1360-61 (M.D. Fla. 2004); *Klimas v. Conn. Gen. Life Ins. Co.*, 2005 U.S. Dist. LEXIS 39709, at *14 (E.D. Pa. Nov. 28, 2005). It can hardly be concluded that the cases demonstrate Broadspire's bias when they mostly uphold decisions consistent with recommendations from Broadspire consultants. Nor does Broadspire's compensation of the reviewing physicians establish a conflict of interest. Unless one presupposes Broadspire's bias, there is equal reason to believe that the compensation scheme simply encourages the reviewers to provide thorough and accurate recommendations to help Broadspire's clients make proper claims determinations and thereby avoid costly litigation. Finally, even in aggregate, Peterson's various evidence, while potentially persuasive if combined with something more, is too inconclusive to fairly warrant the finding that Broadspire operated under a conflict of interest. Higher scrutiny is therefore not warranted on the basis of such a conflict.

### 3.     Disclosure of Evidence

Peterson next argues that a higher standard of review is warranted because FedEx's failure to disclose the reports from Cohan, Sherrer, and Posner prior to issuing the final benefits determination deprived her of an opportunity to respond. The argument is rejected. Although at least one circuit has accepted Peterson's reasoning, *see Abram v. Cargill*, 395 F.3d 882, 886 (8th Cir. 2005), the Ninth Circuit has not. In *Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 732 n.2 (9th Cir. 2006), it was explained that an administrator's disclosure of evidence during litigation rather than during the administrative

appeal provides the ERISA plaintiff with "ample opportunity to respond." The contrary approach of requiring disclosure prior to the final benefits determination would simply "lead to an interminable back-and-forth between the plan administrator and the claimant" because disclosure would inevitably prompt a response from the employee, which would in turn prompt more evaluation. *Id.*; *see also Metzger v. Unum Life Ins. Co. of Am.*, 476 F.3d 1161, 1166-67 (10th Cir. 2007) (rejecting the approach in *Abram* because it "would set up an unnecessary cycle of submission, review, re-submission, and re-review" that would "undoubtedly prolong the appeal process" and "unnecessarily increase the cost of appeals"). The purpose of ERISA's requirement of full and fair review was satisfied with respect to this issue because, even without disclosure of the reports, Peterson had "enough information to prepare adequately for . . . an appeal to the federal courts." *Juliano v. Health Maint. Org. of N.Y.*, 221 F.3d 279, 287 (2d Cir. 2000).

### 4.    Inconsistent Reasons for Denial

Peterson further argues for higher scrutiny on the ground that FedEx provided inconsistent reasons for denying benefits. In the initial letter denying Peterson's claim on June 4, 2004, Broadspire explained that the "documentation submitted . . . [did] not demonstrate objective evidence of a functional impairment of sufficient intensity and severity as to preclude [Peterson] from performing any compensable employment for a minimum of twenty-five hours per week." A.R. at 13. FedEx then stated in its May 5, 2005 letter that benefits were denied because "there were no objective findings that would preclude [Peterson] from engaging in any compensable employment for 25 hours per week." A.R. at 5. Peterson construes these explanations as inconsistent on the theory that whereas the first letter acknowledges that her claim is documented by significant objective evidence and simply finds that the documented conditions are not severe enough to warrant coverage, the second letter denies the existence of any objective evidence.

If anything, the problem with the quoted language is its ambiguity, not its inconsistency. The June 4 letter's statement that the documentation "[did] not demonstrate

36

1  objective evidence of a functional impairment of sufficient intensity and severity" can fairly

2  be read to say either that coverage was denied because there was no objective evidence of

3  any kind or that coverage was denied because existing objective evidence did not

4  demonstrate a sufficiently severe impairment.  The quoted language from the May 5 letter

5  raises the same ambiguity.  By stating that "there were no objective findings that would

6  preclude [Peterson] from engaging in any compensable employment for 25 hours per week,"

7  FedEx could have either been saying that there were no objective findings of any kind or that

8  existent objective findings were insufficient.  Peterson disregards one possible meaning of

9  each statement in arguing that they are inconsistent.

10         Moreover, placing Peterson's selected quotations back into context resolves their

11  ambiguity and reveals that Broadspire and FedEx both explained the denial of coverage as

12  a result of insufficient objective evidence, rather than the total absence of such evidence.  *See*

13  *Elsroth v. Consol. Edison Co.*, 10 F. Supp. 2d 427, 437 (S.D.N.Y. 1998) (explaining that a

14  stated reason for denial must be read in light of the broader context of the denial letter).  In

15  the June 4 letter, for example, Broadspire discussed Peterson's surgery for carpal tunnel

16  syndrome, an MRI that revealed "mild" degenerative changes in her spine, and an MRI

17  showing "mild" chondromalacia patella in her right knee.  A.R. at 13.  Read in tandem with

18  these references, the statement that the record "[did] not demonstrate objective evidence of

19  a functional impairment of sufficient intensity and severity" plainly means that objective

20  evidence existed but was insufficient to warrant coverage.  The same is true of the May 5

21  letter, which discussed x-rays showing "mild" degenerative changes in Peterson's spine,

22  Ortiz's observation of a restricted range of motion in Peterson's neck, and Cohan's

23  conclusion that the medical records do not substantiate an impairment of "sufficient severity

24  and/or intensity" to justify total disability coverage.  A.R. at 4.  To read the May 5 letter as

25  Peterson suggests would require the assumption that FedEx does not consider any of the

26  referenced evidence to be objective.  There is no basis for making that assumption,

27

28
                                                 37

particularly when the summary plan description explicitly lists such evidence as relevant support for a disability claim.

### 5.    Use of an Independent Medical Evaluation

Peterson also contends that FedEx's decision not to obtain an independent medical evaluation justifies a higher level of scrutiny. Although it is a close question, the argument is rejected. There is no absolute requirement that a Plan administrator obtain an independent medical examination. *See Wells v. Reliance Standard Life Ins. Co.*, 2007 U.S. Dist. LEXIS 16885, at *17 (D. Mont. Jan. 11, 2007); *Wirries v. Reliance Standard Ins. Co.*, 2005 U.S. Dist. LEXIS 22152, at *29 (D. Ida. Sept. 1, 2005). Nor does the Plan mandate that FedEx do so. A.R. at 447-48 ("If, in the opinion of the Claims Paying Administrator, the [employee's attending] Practitioner . . . cannot substantiate the Disability for which a claim is being made or benefits are being paid hereunder, such Employee *may* be required to submit himself to an examination by a Practitioner selected by the Claims Paying Administrator.") (emphasis added). An administrator's decision not to obtain an independent examination may warrant a higher level of scrutiny only when the administrator possessed the right to obtain the examination and the claimant's condition could have been better understood through a direct physical examination than by a mere review of the medical record. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005); *Wilson v. John C. Lincoln Health Network Group Disability Income Plan*, 2006 U.S. Dist. LEXIS 14540, at *21 (D. Ariz. Mar. 28, 2006); *Heinrich v. Prudential Ins. Co. of Am.*, 2005 U.S. Dist. LEXIS 15566, at *25-26 (N.D. Cal. July 29, 2005).

Peterson's argument is unpersuasive because of the questionable utility of an independent examination in the circumstances of this case. In *Wilson* and *Heinrich*, the absence of such an examination was troubling because the employee's disability claim partially relied on subjective symptoms that are most effectively evaluated by means of direct observation. *See Wilson*, 2006 U.S. Dist. LEXIS 14540, at *21 ("[T]he need to physically examine an insured is even more pronounced when that person alleges severe pain which

38

objective medical evidence cannot fully corroborate[].”); *Heinrich*, 2005 U.S. Dist. LEXIS 15566, at *25 (describing the usefulness of such an examination in light of the treating physician's inability to use a “completely objective test to evaluate the severity” of the employee's condition).    If an independent examination had been conducted, the administrators in those cases could have drawn more informed conclusions about the credibility of the employee's subjective complaints and, accordingly, the extent of the employee's alleged disability.    The present Plan, however, precludes consideration of exclusively subjective indicia of disability.    Thus, the sole utility of an examination in Peterson's case would have been to obtain additional objective evidence about her conditions, such as new imaging tests.    Because that type of evidence was already abundant in the record, it is doubtful that FedEx would have gleaned any significant new data pertaining to Peterson's condition.    The examiner would have simply offered one more interpretation of what would likely be the same objective evidence that was already discernable on paper when the five Broadspire reviewers and multiple treating physicians opined on the disability claim.

### 6.    Failure to Credit Evidence of Disability

Peterson's final argument is that a high level of scrutiny is justified by FedEx's failure to credit a variety of reliable evidence of disability.    That evidence includes the “Headaches Residual Functional Capacity Questionnaire” completed by Smith, the letter from the vocational expert stating that Peterson is not employable, the letters from Peterson's treating physicians explaining that her disability was supported by significant objective findings, the impact of Peterson's medications on her ability to work, the multiple affidavits supplied by friends and family members, and the disability determination of the Social Security Administration.

In evaluating Peterson's argument, the court is mindful of ERISA's requirement that an employee benefit plan “shall afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named

fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2).  "Full and fair review" must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."  29 C.F.R. § 2560.503-1(h)(2)(iv).  However, because ERISA grants employers "large leeway to design disability . . . plans as they see fit," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003), full and fair review does not require an administrator to credit evidence that cannot support a disability determination under the plain language of a plan, *see, e.g.*, *Maniatty v. Unum Provident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002).

The first step, therefore, is to determine precisely the types of reliable evidence that FedEx was contractually required to consider.  This is a case where divergent wording in the Plan and the summary plan description is material.  The latter defines "significant objective findings" as "those that can be observed by [the employee's] health care professional through objective means, not just from [the employee's] description of the symptoms."  A.R. at 395.  They include "medical examination findings," "test results," "x-ray results," and "observation of anatomical, physiological or psychological abnormalities."  *Id.*  In contrast to this language, the Plan defines "significant objective findings" as "signs which are [1] noted on a test or medical exam and which are [2] considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms."  A.R. at 406.  The requirement that findings must be "noted on a test or medical exam" in order to constitute significant objective findings is unique to the language of the Plan, as the summary plan description simply focuses on whether the findings hypothetically "*can* be observed by [the employee's] health care professional through objective means."  A.R. at 395 (emphasis added).  Thus, depending on whether the Plan definition is applied, FedEx may or may not be contractually required to credit signs of disability noted exclusively in the affidavits from Peterson's friends and family, the letter from the vocational expert, and the disability determination of the Social Security

40

1   Administration.  None of those documents are a "test or medical exam."  Given that the

2   summary plan description alone permits consideration of that evidence and that the evidence

3   if anything supports Peterson's claim, the summary plan description governs.  *Bergt v.*

4   *Retirement Plan for Pilots Employed by Mark Air, Inc.*, 293 F.3d 1139, 1145 (9th Cir. 2002)

5   (explaining that "the provision *more favorable* to the employee controll[s]" in the event of

6   conflict between the Plan and the SPD).

7           Applying the language of the summary plan description, a higher level of scrutiny will

8   be applied because FedEx failed to credit some evidence of disability.  First, and perhaps

9   most significantly, FedEx failed to credit the aggregate effect of all of Peterson's conditions.

10  The appropriate question was not simply whether any single condition was sufficient to

11  warrant a finding of total disability, but also whether the combination of all of Peterson's

12  objectively demonstrated conditions indicated the presence of total disability under the Plan.

13  There is no indication that FedEx engaged that line of inquiry, as the May 5 letter focuses on

14  each of Peterson's conditions in isolation.  In discounting the September 16, 2004 letter from

15  Smith, for example, FedEx stated that the "peer physician found that the medical

16  documentation fails to support . . . conclusions of a *back problem* of such severity that would

17  render Ms. Peterson incapable of work."  A.R. at 4 (emphasis added).  While that statement

18  may be correct, there is no additional discussion regarding whether Peterson's back problem

19  and other conditions are jointly sufficient to cause total disability.  The record suggests that

20  Broadspire's physicians similarly segmented their analyses based on their respective areas

21  of expertise.  *See* A.R. at 307 ("I defer to the appropriate Broadspire ENT and neurologic

22  specialists as to whether [Peterson's] vertigo/ENT abnormalities are of sufficient severity to

23  render her incapable of sedentary work.").  This failure to evaluate the aggregate effect of

24  all of Peterson's impairments warrants a higher level of scrutiny.  *See Lawrence v. Motorola*

25  *Inc.*, 2006 U.S. Dist. LEXIS 63730, at *24 (D. Ariz. Aug. 24, 2006); *Nickola v. CNA Group*

26  *Life Assurance, Co.*, 2005 U.S. Dist. LEXIS 16219, at *30 (N.D. Ill. Aug. 5, 2005).

27

28

1    Second, neither FedEx nor the Broadspire reviewers credited the Headaches Residual

2    Functional Capacity Questionnaire in which Smith reported on the basis of "objective

3    signs"–including tenderness, impaired sleep, x-rays, and MRI tests–that Peterson suffers

4    from daily migraines that "preclude[ her] from performing even basic work activities." A.R.

5    at 52.  The questionnaire indicated that Peterson's headaches last approximately "90% of

6    [the] day," that her health would require her to take unscheduled "15-20 minute" breaks

7    "every 45-60 minutes" during an 8-hour workday, that she is "incapable of even 'low [work]

8    stress,'" and that her impairments would force her absence from work "more than three times

9    a month." A.R. at 50, 52-53.  While the treating-physician rule does not apply in the context

10   of ERISA and "courts [may not] impose on plan administrators a discrete burden of

11   explanation when they credit reliable evidence that conflicts with a treating physician's

12   evaluation," neither may a plan administrator "arbitrarily refuse to credit a claimant's reliable

13   evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834.  Smith's

14   questionnaire was both uncontradicted by the remainder of the medical record and

15   undisputed by Broadspire and FedEx.  The questionnaire was listed as one of Peterson's

16   records in Broadspire's "peer review data sheet," but that reference does not show that

17   Broadspire gave the document any significance in the decision calculus.  *See* A.R. at 304.

18   It was improper for FedEx to disregard the questionnaire in this fashion. *Sanderson v. Cont'l*

19   *Cas. Corp.*, 279 F. Supp. 2d 466, 480-81 (D. Del. 2003).

20   Third, FedEx improperly failed to credit the affidavits from Peterson's lay witnesses.

21   This conclusion follows in part from the language of the summary plan description, which

22   is ambiguous about whether the source of "significant objective findings" must be a

23   physician.  On one hand, the summary plan description explains that significant objective

24   findings are "necessary to substantiate the period of time your health care professional

25   indicates you are disabled." A.R. at 395.  FedEx also lists "medical examination findings,"

26   "test results," and "x-ray results" as examples of permissible objective findings. *Id.*  All of

27   that language seems to suggest that the source of the objective findings must be a health care

28                                              42

professional such as a physician.  On the other hand, the summary plan description defines significant objective findings as "those that *can* be observed by [the employee's] health care professional through objective means, not just from [the employee's] description of the symptoms."  A.R. at 395 (emphasis added).  The use of the word "can" may be reasonably interpreted to signal that the objective findings must simply be hypothetically observ*able* by a health care professional.  Under this reading of the summary plan description, lay witnesses can be the source of the objective findings as long as their findings could also be observed by the employee's physician.  Because ambiguities in a summary plan description must be resolved in favor of the employee, the court adopts this latter interpretation.  *See Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991); *Springs Valley Bank & Trust Co. v. Carpenter*, 885 F. Supp. 1131, 1141 (S.D. Ind. 1993); *White v. Keychoice Welfare Benefit Plan*, 827 F. Supp. 690, 697 (D. Wyo. 1993).

Peterson's affidavits contain a variety of objective findings that could be observed by her treating physicians.  Peterson's daughters explain that she is unable to sit, stand, or walk for more than 10 to 15 minutes without changing positions due to pain.  A.R. at 150, 153.  They also state that Peterson exhibits difficulty paying attention, suffers from exhaustion and fatigue that prevents her from engaging in a variety of daily activities, limps, requires frequent breaks due to dizziness, and cries often and expresses feelings associated with depression.  A.R. at 150-58.  In light of the ambiguous language of the summary plan description, failure to credit this corroborative evidence of disability contributes to the finding that higher scrutiny is required.  *See Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1121 (10th Cir. 2006).

Peterson's remaining arguments for higher scrutiny are unpersuasive.  While FedEx's May 5 decision did not discuss the letters from Peterson's treating physicians, the effect of Peterson's medications, or the opinion of the vocational expert, FedEx "is not required to disclaim every piece of evidence" that Peterson has raised.  *Weidner*, 2006 U.S. Dist. LEXIS 27817, at *24-25; *see also Nord*, 538 U.S. at 834 (explaining that a "discrete burden of

43

explanation" may not be imposed on a plan administrator when it credits reliable evidence that conflicts with a treating physician's evaluation).  Broadspire's reviewers explicitly discounted the significance of the physicians' letters and the vocational expert's report on the ground that they were unsupported by objective evidence. *See* A.R. at 300-01, 306, 313. Posner explained that while at least some of Peterson's medications are known to cause "dizziness, drowsiness, and fatigue," those effects were unlikely in Peterson's case because they tend to subside over time and Peterson had already taken her medications for a substantial period.  A.R. at 313.  FedEx plainly read these assessments.  Its tacit acceptance of them was sufficient.

Peterson's final argument is that FedEx acted improperly by failing to credit the award of the Social Security Administration.  She reasons that because the definition of disability on which that award was based is more stringent than FedEx's definition of total disability, the award should have counted as an indicium of impairment under the Plan.  This argument is also unpersuasive.  First, it is not clear that the Social Security Administration's definition of disability is actually more stringent than the definition utilized by FedEx in a way that is material to this case.  Under 42 U.S.C. § 423(d)(1), "disability" is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

For the purposes of section 423(d)(1), an individual may be found disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  By contrast, as quoted earlier, the Plan defines "total disability" as

> the complete inability of a Covered Employee, because of a medically determinable physical impairment (other than an impairment caused by a mental or nervous condition or a

44

Chemical Dependency), to engage in any compensable employment for twenty-five hours per week for which [she] is reasonably qualified (or could reasonably become qualified) on the basis of [her] ability, education, training or experience.

A.R. at 415.  The summary plan description in turn explains that "total disability" means that the employee "cannot engage in any compensable employment for 25 hours per week for which [she] is reasonably qualified or could reasonably become qualified on the basis of [her] ability, education, training or experience."  A.R. at 393.

The definition of disability employed by the Social Security Administration is more stringent in two respects.  First, the definition requires that the impairment result in an expectation of death or at least 12 months of continuous disability.  Second, "substantial gainful activity" encompasses jobs that entail even less than 25 hours of employment per week.  *See* 20 C.F.R. § 404.1572(a) (providing that even "part-time" work is "substantial" if it "involves doing significant physical or mental activities"); *see also, e.g.*, *Wolfe v. Shalala*, 997 F.2d 321, 324 (7th Cir. 1993) (holding that a job requiring a commitment of only two afternoons per week was a "substantial gainful activity").

On its face, however, the Plan definition is in some ways more stringent.  While 42 U.S.C. § 423(d)(1) explicitly provides that disability benefits may be founded on mental impairment, the Plan explicitly excludes coverage for disability caused by such impairment.  Additionally, the Plan denies coverage on the basis of an ability to engage in compensable employment for 25 hours per week even if the employee is not qualified to pursue such employment at the time of the disability determination.  So long as the employee "could reasonably become qualified," total disability will not be found.  A.R. at 415.  By contrast, the Social Security Administration looks only at the claimant's established education and work experience in order to determine qualification for employment.   42 U.S.C. § 423(d)(2)(A).

Given these conflicting factors and the absence of any supporting argument from the parties, it is difficult to conclusively determine the relative stringency of the Plan and Social

45

Security definitions. Yet even assuming that the FedEx definition of "total disability" sets the most exacting requirements, it does not follow that FedEx erred in choosing not to credit Peterson's prior Social Security award. Courts have looked unfavorably upon a plan administrator's decision to deny disability benefits after the Social Security Administration has already determined on the basis of a stricter definition of disability that the applicant is entitled to benefits, *see, e.g.*, *Glenn v. Metlife*, 461 F.3d 660, 668 (6th Cir. 2006), but it is also recognized that there are "critical differences between the Social Security disability program and ERISA benefits plans," *Nord*, 538 U.S. at 823. ERISA, for example, grants employers "large leeway to design disability . . . plans as they see fit," *id.* at 833, and does not utilize the treating-physician rule that typically grants primacy to the opinions of treating physicians, *see Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 879 (9th Cir. 2003). These differences diminish the relevance of Social Security awards to benefits determinations under ERISA. *Wilcox v. Metro. Life Ins. Co.*, 2006 U.S. Dist. LEXIS 33298, at *21-22 (D. Ariz. May 22, 2006). If Peterson's Social Security award hinged exclusively on one of the substantive or procedural idiosyncrasies of the Social Security Act, FedEx could not be faulted for declining to weigh that award in her favor.

The Social Security award is particularly irrelevant here because it was not even part of the administrative record that was available to FedEx. Without an opportunity to review the determination, the company had no way of knowing, much less evaluating, the reasoning that motivated the award. FedEx's decision not to credit the determination of the Social Security Administration does not justify heightened scrutiny in such circumstances. *Denmark v. Liberty Life Assurance Co. of Boston*, 481 F.3d 16, 39 (1st Cir. 2007) ("Because the [Social Security Administration's] decision was not available to [the plan administrator] when it made its decision, [the administrator] cannot be faulted for failing to factor the [Social Security] decision into its final decision.").

Peterson also argues, however, that heightened scrutiny is warranted because FedEx declined to credit the Social Security award even after reducing her Plan-funded disability

46

payments in proportion to that award. *Ladd v. ITT Corporation*, 148 F.3d 753, 756 (7th Cir. 1998), found that the such conduct constitutes an implicit repudiation of one legal victory in order to win a second and thus falls "within the penumbra of the doctrine of judicial estoppel." More searching judicial scrutiny was therefore applied. *Id.* The court, however, respectfully disagrees with *Ladd*. ERISA affords plan administrators "large leeway" to craft benefits plans "as they see fit," *Nord*, 538 U.S. at 833, so there can be little basis for criticism if the administrator's actions were permitted under the benefit plan itself. Moreover, a reduction in benefits proportionate to the value of a Social Security award cannot necessarily be construed as a concession that benefits should also be granted under a private plan. As explained above, ERISA and the Social Security Act are procedurally and substantively different in multiple respects, so an award under one statutory framework may provide little insight on the merits of an award under the other.

To the extent that Peterson argues that FedEx did not *review* its evidence, that argument is also rejected. The record shows that FedEx did review the evidence that was submitted. A.R. at 3 ("The Committee reviewed all information presented, including medical documentation from Ms. Peterson's treating providers and Broadspire's peer physician reviews."). Peterson provides no reason to believe otherwise.

In summary, FedEx did not provide timely notification of its decision to deny benefits and it failed to give any weight to some reliable evidence of disability, including the affidavits from the lay witnesses and the Headaches Residual Functional Capacity Questionnaire completed by Smith. FedEx also failed to consider the aggregate effect of Peterson's various conditions. For these reasons, a moderate level of scrutiny will be applied to FedEx's decision to deny long-term total disability coverage to Peterson.

### D.    Whether FedEx Abused its Discretion

Turning to the final stage of analysis under *Abatie*, Peterson argues that FedEx construed the Plan in a fashion that conflicts with its plain language by importing a previously non-existent requirement that an impairment be "severe" in order to trigger total-

47

1   disability coverage.  On this view, the term "significant objective findings" means that the
2   evidence of impairment need only show that Peterson's impairment is significant, not that
3   it is severe.  Peterson alternatively contends that her impairment need not be severe because
4   the term "significant objective findings" is ambiguous and should be construed in her favor.
5   Finally, Peterson argues that FedEx relied on clearly erroneous findings of fact in concluding
6   that she is not totally disabled.  Each of these arguments would, if persuasive, indicate that
7   FedEx abused its discretion.  *See Taft*, 9 F.3d at 1472-73.

8               **1.      FedEx Did Not Abuse its Discretion in Interpreting the Plan**

9           "Eligibility for benefits under any ERISA plan is governed in the first instance by the
10  plain meaning of the plan language." *Threadgill v. Prudential Sec. Group*, 145 F.3d 286, 292
11  (5th Cir. 1998); *see also Canseco v. Constr. Laborers Pension Trust for S. Cal.*, 93 F.3d 600,
12  608 (9th Cir. 1996).   An ERISA plan administrator must make exclusionary clauses
13  "conspicuous, plain, and clear, placing them in such a fashion as to make obvious their
14  relationship to other policy terms." *Saltarelli v. Bob Barker Group Med. Trust*, 35 F.3d 382,
15  385 (9th Cir. 1994).  Terms may be construed in favor of the employee if they remain
16  ambiguous after applying ordinary principles of contract interpretation. *Wegner v. Standard*
17  *Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997).

18          Moving to the plain language of the Plan, FedEx defines "significant objective
19  findings" as "signs which are noted on a test or medical exam and which are considered
20  significant anatomical, physiological or psychological abnormalities which can be observed
21  apart from the individual's symptoms."  A.R. at 406.  The definition thus uses the word
22  "significant" to describe the findings themselves, seeming to indicate that the findings must
23  be "important" or "notable," and also to describe the requisite extent of the employee's
24  abnormalities. Oxford English Dict. (2d ed. 1989).  While neither usage is explicitly defined
25  in the Plan, it is apparent that the latter must be understood in reference to the definition of
26  "total disability."   That is, anatomical, physiological, or psychological abnormalities are
27  "significant" if they preclude the employee from engaging in "any compensable employment

28                                                    48

1  for twenty-five hours per week for which [she] is reasonably qualified (or could reasonably

2  become qualified) on the basis of [her] ability, education, training or experience." A.R. at

3  415. Read in context, therefore, "significant objective findings," i.e., objective findings that

4  are important or notable, are those that reveal that the employee is totally disabled.

5  　　　In light of this plain meaning, there is no basis for concluding that FedEx abused its

6  discretion by requiring that the objective evidence show an impairment that is "severe"

7  enough to preclude Peterson from engaging in qualifying employment. Whether one chooses

8  to characterize the requisite degree of impairment as "severe" or "significant" is immaterial

9  because neither term has meaning except in reference to FedEx's definition of "total

10  disability." So long as the impairment does not preclude the employee from sustaining work

11  identified by that definition, it is neither significant enough nor severe enough to warrant

12  total-disability coverage. Likewise, if the impairment prevents the employee from engaging

13  in any compensable employment for 25 hours per week for which she is qualified, it is both

14  sufficiently severe and sufficiently significant to justify a finding of total disability. The

15  word "severe" is functionally synonymous with "significant" in the circumstances of this

16  case. The Plan is not ambiguous.

17  　　　FedEx correctly applied this interpretation in its May 5 decision letter. That document

18  does not say that FedEx denied benefits because Peterson's condition was less than "severe"

19  in an abstract sense. The import of the letter is instead that benefits were denied because the

20  objective findings did not indicate an impairment that was *sufficiently* severe to "preclude

21  [Peterson] from engaging in any compensable employment for 25 hours per week." A.R. at

22  5. FedEx only required severity of impairment insofar as it was already implicitly required

23  by the Plan's definition of "total disability."

24  　　　**2.    FedEx Abused is Discretion in Interpreting the Medical Record**

25  　　　The final issue to be determined is whether FedEx abused its discretion by erroneously

26  finding that Peterson's carpal tunnel syndrome, plantar fasciitis, degenerative disc disease,

27

28

1   chondromalacia patella, vertigo, fatigue, and migraines,[1] in aggregate and to the extent

2   substantiated by significant objective findings, would not preclude her from engaging in "any

3   compensable employment for twenty-five hours per week for which [she] is reasonably

4   qualified (or could reasonably become qualified) on the basis of [her] ability, education,

5   training or experience."[2] A.R. at 415.  Under normal abuse-of-discretion review, the question

6   would be whether FedEx's disability findings were "clearly erroneous."  *See Bendixen*, 185

7   F.3d at 944.  However, because a moderately higher level of scrutiny is required under

8   *Abatie*, a more searching inquiry will be made.

9          From the record and under this intermediate level of deference, it is apparent that

10   FedEx abused its discretion by finding that Peterson is not totally disabled.  First, the

11   objective evidence that Peterson suffers from frequent and severe headaches is

12   uncontroverted.  Cohan's review acknowledges that a brain MRI revealed "white matter

13   changes consistent with migraine syndrome." A.R. at 301.  Peterson's former co-worker and

---

15          [1] The results from the MRI that revealed Peterson's migraines were not directly
16   included in the final administrative recorded.  *See* Doc. # 48, Exh. D at 1.  However, they
     were reviewed and explicitly discussed by Cohan, and FedEx in turn examined Cohan's
17   report.  *See* A.R. at 301 ("An MRI of the brain had been performed which revealed no
     significant abnormalities other than white matter changes consistent with migraine
18   syndrome."); A.R. at 304 (listing "MRI of the brain dated 12/04/03" as part of the record
     reviewed by the Broadspire physicians).  Because FedEx was effectively presented with that
19   evidence via Cohan's report, it will be considered in deciding whether FedEx abused its
     discretion.  *See McKenzie v. Gen. Tel. Co.*, 41 F.3d 1310, 1316 (9th Cir. 1994); *see also*
20   *Buchanan v. Reliance Standard Life Ins. Co.*, 5 F. Supp. 2d 1172, 1180-81 (D. Kan. 1998)
21   (considering evidence not directly part of the administrative record because it was clearly
     described by another document that was in the administrative record).
22

23          [2] FedEx was not required to consider Peterson's evidence of fibromyalgia because that
24   condition is purely subjective and thus cannot support total-disability coverage under the
     Plan.  *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th
25   Cir. 2003) (explaining that "fibromyalgia's cause or causes are unknown, there is no cure,
     and, of greatest importance to disability law, its symptoms are entirely subjective"); *Walker*
26   *v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999) (stating
27   that "no objective test exists" for fibromyalgia).

28

three daughters each supplied corroborating affidavits describing the condition and the restrictions it imposed on Peterson's daily activities, including an inability to concentrate. Moreover, Smith's Headaches Residual Functional Capacity Questionnaire indicates that the headaches are documented by "objective signs" in the form of "tenderness," "impaired sleep," x-rays, and MRIs. A.R. at 51. The questionnaire further indicates that the headaches alone would "generally preclude" Peterson from "performing even basic work activities" because they occur on a daily basis, last "90% of [the] day," intensify with work-related stress, and would require frequent breaks and absences. A.R. at 50-53. Accepting such uncontested evidence at face value, it is hard to imagine how Peterson could sustain even part-time employment.

Second, the lay affidavits all express that Peterson is unable to work and reveal that the impairments discussed abstractly in the medical record have imposed significant functional restrictions. Peterson's three daughters each explain that she cannot sit, stand, or walk for more than 10 to 15 minutes without changing positions due to pain and that she is always exhausted. They also state that Peterson limps from plantar fasciitis, requires frequent breaks due to fatigue and dizziness, cries often and expresses feelings associated with depression, and is often unable to participate in a range of normal daily activities such as shopping, cleaning, and participating in activities with family members. A.R. at 150-58. These statements were based on frequent observation and constitute significant objective findings. *See* A.R. at 395 (listing "observation of anatomical, physiological or psychological abnormalities" as a form of significant objective findings). While lay evidence of this nature would not necessarily be persuasive on its own, its consistency with the opinions objective findings provided by the treating physicians renders it persuasive.

Third, Peterson's physicians consistently translated her conditions into a severely limited functional capacity, and no tenable response was made to these findings. Smith's September 2004 evaluation indicated that Peterson is unable to sit for more than 20 minutes at a time or 3 total hours per day, unable to stand for more than 10 minutes at a time or one

total hour per day, and unable to walk for more than 5 minutes at a time or 40 minutes total per day.  Peterson's conditions, he added, would require her to miss approximately 50% of a standard work schedule, alternate sitting and standing every 15 minutes, and take breaks every 45-60 minutes. A.R. at 43-47.  Habros's evaluation indicated similarly. A.R. at 81-85.

Cohan dismissed Smith's evaluation on the ground that the reported restrictions "would certainly be consistent with performance of a sedentary occupation." A.R. at 300. Yet even as a matter of simple arithmetic, it is difficult to see how an individual who cannot sit for more 3 hours each day, stand for more than one hour, and walk for more than 40 minutes could work for 25 hours per week.  Habros's evaluation was dismissed as unsubstantiated by objective evidence, but that is plainly incorrect.  Habros personally observed Peterson's fatigue and various areas of muscle tenderness, and imaging tests showed that Peterson suffers from degenerative disc disease, plantar fasciitis, migraines, a history of carpal tunnel syndrome, vertigo, and chondromalacia patella.  Moreover, Habros's evaluation itself contained permissible evidence of disability.  The summary plan description explicitly provides that a disability claim may be founded on "medical examination findings." A.R. at 395.  The term "findings" implies an interpretive act on the part of the treating physician.  Whether such interpretation may go exclusively to the existence of an impairment (e.g., the x-ray reveals that the employee has plantar fasciitis) or also to the functional implications of the impairment (e.g., the employee's plantar fasciitis, as revealed by the x-ray, would prevent her from walking for more than one hour per day) is left unstated in the Plan.  Construing this ambiguity in Peterson's favor, the reasonable interpretation is that the Plan permits both, and accordingly that Habros's findings on the functional implications of the impairments can themselves help to substantiate the presence of total disability. *Bergt*, 293 F.3d at 1145.

Fourth, by failing to consider the aggregate affect of all of Peterson's conditions, FedEx and the Broadspire physicians arrived at a false impression about her overall functional capacity.  While an employee who suffers only from mild vertigo, for example,

is likely capable of pursuing 25 hours of employment per week, and while the same is likely true for an employee who suffers from any number of other isolated impairments, it is another matter altogether where the employee suffers not only from vertigo, but also carpal tunnel syndrome, plantar fasciitis, degenerative disc disease, chondromalacia patella, fatigue, and migraines. The only evaluations that explicitly considered the interactive effects of Peterson's impairments were provided by the treating physicians and, unsurprisingly, found that Peterson is totally disabled. *See* A.R. at 41, 54-56, 81, 87-89, 105-07, 115-17.

Fifth, FedEx improperly discounted the report from the vocational expert, John Komar, who found that Peterson's impairments would disqualify her from all employment. Not only was there no contrary evidence from another vocational expert, Cohan simply rejected Komar's report on the inaccurate ground that it was unsubstantiated by objective evidence. Komar clearly explained that his finding was based on several months of counseling and assessment of Peterson's "residual functional assets." A.R. at 141. It is obvious that the report reflected Komar's direct observations of Peterson's impairments.

Finally, the court notes that a total-disability determination cannot reasonably hinge on whether an employee is minimally capable, on a good day, at the right hour, of fulfilling her job duties in barely tolerable fashion. Qualification for employment requires an ability to work effectively and to be reliable. FedEx found Peterson disabled from her own job, by significant objective findings, and has no job to call her back to that meets any of its needs. It is not persuasive or even plausible that another employer would put her on a payroll for work that will be performed sporadically and cannot be counted on.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. # 48) is GRANTED.

IT IS FURTHER ORDERED that Defendants' Cross-Motion for Summary Judgment (Doc. # 52) is DENIED.

IT IS FURTHER ORDERED that the parties submit a form of judgment by June 18, 2007, that provides for past benefits and interest in stated amounts and future benefits at

stated rates.  If the parties cannot agree, they shall submit separate forms of judgment with supporting memoranda and proof to allow the court to make a proper determination.

DATED this 4th day of June 2007.

_____
Neil V. Wake
United States District Judge

54